JOHN BOLL, Appellant, *v.* SHARP & DOHME, INC., Respondent.

First Department, April 21, 1953.

*Abraham Markhoff* of counsel (*Julian H. Gottlieb* with him on the brief; *Markhoff & Isaacson,* attorneys), for appellant.

*John J. Brophy* of counsel (*Francis M. Walsh* with him on the brief; *Barry, Treanor & Shandell,* attorneys), for respondent.

VAN VOORHIS, J. The complaint has been dismissed on motion by defendant for summary judgment, upon the ground that plaintiff's cause of action is barred by a release, or, speaking more accurately, by a covenant not to sue. Plaintiff was a blood donor for hire. The complaint alleges that upon the occasion of a blood donation by him in defendant's office, he fell, thereby suffering serious and permanent personal injuries. Various acts and omissions are claimed to have constituted causal negligence by defendant, including failure to take precautions to prevent plaintiff from falling after extraction of his blood.

It is admitted that plaintiff supplied blood to defendant on previous occasions, and that upon this occasion he had signed a covenant not to sue in the form set forth in the opinion by Mr. Justice BREITEL.

Although the complaint does not state precisely how plaintiff came to fall, and his position would be stronger on this motion if he had submitted an affidavit of his own describing the details, the complaint must be construed liberally upon a motion of this character. It is sufficiently clear that plaintiff's contention is that he fainted during or immediately after the extraction of his blood while he was in defendant's office, that in the exercise of reasonable care such an occurrence should have been anticipated and prevented, and that a triable issue in negligence is presented. There is little doubt that this is what the complaint means. If doubt exists that it alleges this, plaintiff should be allowed to amend, and the cause of action should not be dismissed upon the broad ground that all possible causes of action of that nature are precluded by the paper which plaintiff signed immediately before the accident.

For the purposes of this opinion, it is assumed, therefore, that the complaint states that plaintiff's injuries were sustained in the manner above described. In this view of plaintiff's case, which is the natural and probable interpretation, it becomes important to examine the scope of this covenant not to sue. Releases or covenants of this nature have always been scrutinized, and have been enforced with many qualifications. Courts have always hesitated to allow parties to absolve themselves from the obligation to exercise ordinary care in human relationships, by contracting that the operation of the law of negligence shall be suspended in broad areas of conduct. The statement was made at the Appellate Division in an opinion by HISCOCK, J., in *Johnston* v. *Fargo* (98 App. Div. 436, 442, affd. 184 N. Y. 379) that " The general principle that contracts breaking down common-law liability and relieving persons from just penalties for their negligent and improper conduct are not to be favored, and should not be given an enforcement beyond that demanded by their strict construction, has been announced by the courts with often-repeated reiteration." Elsewhere it has been stated that " Contracts exempting from liability for negligence are not favored by the law; they are strictly construed against the party relying on them, and clear and explicit language in the contract is required to absolve a person from such liability." (17 C. J. S., Contracts, § 262.)

In view of this acknowledged principle, it is pertinent to inquire whether the covenant not to sue, in the instant case, is broad enough to exempt defendant from all manner of negligence upon its part in taking plaintiff's blood. This case does not pose the question whether such an instrument is invalid,

in its entirety, nor, necessarily, whether any part of it be void. The main question is one of construction. In this context, the rule should be borne in mind, that parties are not construed to have intended to exempt themselves from the consequences of their own negligence in the absence of express language to that effect (*Howard* v. *Handler Bros. & Winell,* 279 App. Div. 72, affd. 303 N. Y. 990).

The dominant purpose of this covenant is to relieve Sharp & Dohme, Inc., from liability in event that it were to develop that plaintiff was not in proper physical condition to give blood. To that end, the form which plaintiff signed contains the statement that "I certify that I have not consulted nor been attended by a doctor during the six weeks immediately preceding the date hereof, and that I am at my own risk submitting to the tests, examinations and procedures customary in connection with donations of blood. I agree that neither the Sharp & Dohme Donor Center, New York, nor any surgeons, physicians, technicians, nurse, agents or officers connected with Sharp & Dohme, Incorporated, or who may be participating otherwise in this work, shall be in any way responsible for any consequences to me *resulting from the giving of such blood* ". (Italics supplied.) Nothing in the instrument, up to this point, purports to exempt defendant from using ordinary care in the methods employed in taking plaintiff's blood while he was in defendant's office. In fact, the statement that plaintiff is submitting to the " procedures customary " in connection with donations of blood, excludes any assumption that he is sanctioning departures from common practice, which furnishes the standard of reasonable care. The document merely absolves defendant from responsibility to investigate whether plaintiff is a fit subject to make a blood donation and for the untoward consequences of the taking of blood by the customary procedures. The subsequent language in the instrument purports to accomplish no more than this.

It was manifestly not intended that defendant was to be freed from consequences resulting from negligence in its technique in taking blood, such as, for example, causing blood poisoning through neglecting to sterilize instruments. This would be the reasonable and natural interpretation, even without the canon of construction that relief from the consequences of one's own negligence is not assumed to have been intended in the absence of express words to that effect. The duty of defendant to employ customary procedures in taking blood is expressly affirmed, which is tantamount to declaring that the duty to use

reasonable care *shall* apply to the procedures in defendant's office.

The final clause, usual in general releases, does not broaden the foregoing. It simply states that plaintiff releases and discharges " all claims and demands whatsoever which I or my heirs, executors, administrators or assigns have or may have against them or any of them by reason of any matter relative or incident to such donation of blood." This is just the omnibus clause which ordinarily concludes a general release, and has been construed by the courts, under the rule of *ejusdem generis,* to include only such matters as have been more particularly described in the instrument (*Haskell* v. *Miller,* 221 App. Div. 48, affd. 246 N. Y. 618; *Mitchell* v. *Mitchell,* 170 App. Div. 452, 456).

Fainting from loss of blood, or at the sight of blood, is a common experience. If we could not take judicial notice of it, plaintiff should have opportunity to prove that fact without having his complaint finally dismissed. Except for the covenant not to sue, it could hardly be disputed that it would be for the trier of the fact to determine whether the duty to use reasonable care would require defendant to anticipate that plaintiff might become faint, and to take reasonable measures to protect him from injury in case he were to fall while unconscious. We are not enlightened concerning, and cannot determine on this motion for summary judgment, what the customary procedures are and whether they were observed in this case. We hold that the covenant here, properly construed, does not exonerate defendant from the employment of due care in its procedures or relieve it from negligence in any found departure from customary procedures.

The judgment and order appealed from by plaintiff dismissing the complaint upon defendant's motion for summary judgment should be reversed, and said motion should be denied, with costs. Insofar as the order denies plaintiff's motion to strike out the defense of release or covenant not to sue, the order should be affirmed, leaving the coverage and validity of the instrument to be decided after a trial, at which it can be ascertained precisely how this accident occurred.

BREITEL, J. (dissenting). Involved in this case is the question whether a written agreement to exculpate defendant from liability in the taking of blood is valid. Plaintiff sold his blood to defendant for $5, and sustained injuries following the blood donation. Before the sale plaintiff had signed an exculpatory agreement. Special Term granted defendant summary judgment and denied plaintiff's motion to strike out an affirmative

defense based on the written agreement. Plaintiff appeals.

Plaintiff, a truck driver, sustained injuries from a fall following a blood donation to defendant, a private drug manufacturing corporation. The complaint generally alleges that the defendant was guilty of negligence in each step of the procedure, before, during and after the taking of blood. Before the giving of blood plaintiff signed the following paper:

## " RELEASE.

IN CONSIDERATION of an agreement to pay me the sum of $5.00, in the event that I am accepted as a blood donor, I agree that I will, if accepted, voluntarily furnish blood to the Sharp & Dohme Donor Center, New York City, and for that purpose I certify that I have not consulted nor been attended by a doctor during the six weeks immediately preceding the date hereof, and that I am at my own risk submitting to the tests, examinations and procedures customary in connection with donations of blood. I agree that neither the Sharp & Dohme Donor Center, New York, nor any surgeons, physicians, technicians, nurses, agents or officers connected with Sharp & Dohme, Incorporated, or who may be participating otherwise in this work, shall be in any way responsible for any consequences to me resulting from the giving of such blood or from any of the tests, examinations or procedures incident thereto, and I hereby release and discharge each and all of them from all claims and demands whatsoever which I or my heirs, executors, administrators or assigns have or may have against them or any of them by reason of any matter relative or incident to such donation of blood.

" IN WITNESS WHEREOF, I have hereunto set my hand and seal this 30 day of March, 1949.

JOHN BOLL (Seal)

Donor

Witness:

L      "

On the other side of this paper appeared the following:

## " RECEIPT.

" Received the sum of $5.00 in full payment for blood furnished by me on the date given and pursuant to the agreement on the reverse side hereof.

JOHN BOLL

Donor's Signature "

The following distinctions should immediately be made. While the foregoing document purports to release from liability physicians and nurses, that question is not before us. All we are now concerned with is the attempted waiver of liability on the part of the corporation. A different situation will be presented to us in an action against a licensed physician or nurse, grounded upon a charge of negligence or other professional misconduct on their part. In such circumstances a court may well hold that because defendants are engaged in licensed regulated professions with standards of care imposed by law no attempt to waive liability should be sustained. The analogy might be made to the areas of common carriers, public utilities and related fields where, the responsibilities being mandated by law, the courts have held that such responsibilities may not be in part avoided by agreements between the parties. But in the instant case the question is whether the corporation, a drug manufacturing enterprise, may by voluntary agreement relieve itself of liability in the taking of blood by its agents, who may or may not be licensed professional persons. It is our view, for the reasons discussed below, that there is no rule of law, statute or principle of public policy that inhibits the making of such a voluntary agreement of waiver. It is further our view that for a court to strike down such an agreement is an arrogation of legislative power and without sufficient data or facts to support the exercise of such power.

On the motion for summary judgment no affidavit by plaintiff was submitted, but one only by his attorney. This affidavit asserts that plaintiff never read the paper he signed, a statement properly disregarded by Special Term, and that the agreement is void as against public policy.

Plaintiff admitted, after notice, that '' he had voluntarily donated blood at the same blood center on prior occasions, and had executed a certain form prior thereto ''.

The preceding writing, although it uses words of release, because it relates to future liability, is not a release, but a covenant not to sue. (*Wilder* v. *Pennsylvania R. R. Co.*, 245 N. Y. 36, 39.) In any event, if valid, it operates as a waiver of liability.

A sensible reading of the document indicates an expressed intention to waive any liability of defendant to plaintiff in connection with any matter arising from the blood donation. Hence, there is no occasion for interpretation. The only effect would be to avoid the intention of the parties. The special situation in the third-party indemnity cases involves genuine

questions of interpretation, namely, whether indemnitee is to be saved harmless merely from the acts of others or whether it is also to be saved harmless from its own wrongful acts. (*Thompson-Starrett Co.* v. *Otis Elevator Co.*, 271 N. Y. 36.) Moreover, such interpretation postpones facing up to the basic question of policy whether an exculpatory agreement is valid in this kind of case, the only issue raised by the parties.

The courts have had many occasions to pass upon agreements to waive liability, and in many different contexts. (175 A. L. R. 12 *et seq.*) Always involved is the weighing of the protective or regulatory social policy against the principle of freedom of contract.

Where the parties stand in the relation of employer and employee the courts have held invalid an agreement to waive the employer's liability in tort. (*Johnston* v. *Fargo*, 184 N. Y. 379.) In holding such agreements invalid it is emphasized that the State has enacted many laws to protect the employee, and that an agreement which would defeat the spirit of such laws must be declared invalid. (See, also, *Western Union Tel. Co.* v. *Cochran*, 302 N. Y. 545.)

Where a duty is prescribed by law, such, for example, as with respect to a common carrier or public utility, the courts have struck down as invalid exculpatory agreements. They did so on the ground that the effect would be to nullify in part or in whole the mandate of the law. (E.g., *Mynard* v. *Syracuse, etc., R. R. Co.*, 71 N. Y. 180; *Conklin* v. *Canadian-Colonial Airways*, 266 N. Y. 244.)

On the other hand, where a railroad passenger rides on a free pass or a reduced rate ticket, exculpatory agreements have been sustained as valid. (*Wells* v. *New York Central R. R. Co.*, 24 N. Y. 181; *Anderson* v. *Erie R. R. Co.*, 223 N. Y. 277.)

In other situations the courts, in the absence of specific legislation, have sustained exculpatory agreements as valid. (*Johnson* v. *Star Permanent Wave Corp.*, 237 App. Div. 868; *Mercante* v. *Hygrade Food Products Corp.*, 258 App. Div. 641; 261 App. Div. 829; *Massa* v. *Wanamaker Academy of Beauty Culture*, 80 N. Y. S. 2d 923.)

The *Johnson* case involved administration of a permanent hair wave with distinct implications affecting the health and physical welfare of the customer. The *Massa* case likewise involved physical injuries, namely scalp burns, sustained as a result of a beauty treatment. The agreement in the *Massa* case was held inapplicable on the facts, but the assumption was

that the agreement was valid as far as it extended. The same principle was applied in Massachusetts with respect to a customer who undertook to receive a hair treatment, signed a waiver agreement, and sustained injuries. (*Barrett* v. *Conragan*, 302 Mass. 33.) The *Mercante* case involved an exculpatory agreement made by two painters retained to paint defendant's building. It should be noted too that in each of these situations plaintiff was buying a service, whereas in our case, the plaintiff was the one who was selling something for which he received a stipulated consideration. On the other hand, it should be noted also that here it is the purchaser rather than the seller who controls the process used in the transaction.

Where an express statute is adopted making void, prospectively, an exculpatory agreement, the courts will hold the agreement invalid, but only after a searching analysis of the constitutional basis for the encroachment on the right to contract. (*Billie Knitwear, Inc.,* v. *New York Life Ins. Co.,* 174 Misc. 978, affd. 262 App. Div. 714, with vigorous dissent by then Presiding Justice MARTIN, affd. 288 N. Y. 682.) In this case section 234 of the Real Property Law was involved. It made, and makes, void provisions in leases of real property exculpating the landlord from liability for its own negligence.

The foregoing analysis is expressed in the text writings on the subject. (2 Restatement, Contracts, § 575; 6 Williston on Contracts [Rev. ed.], § 1751C; Prosser on Torts, § 51; 37 Col. L. Rev. 248 *et seq.*; 38 Am. Jur., Negligence, § 8; 17 C. J. S., Contracts, § 262.) From these authorities, we also see that the pattern is generally the same in the sister States.

The only question that then remains, the precedents being clear in limiting the holdings that rule exculpatory agreements invalid, is whether on the facts here there are circumstances impelling the court to expand its interpretation and application of public policy.

In the first place, there cannot in a single case such as this be enough facts. This is not a situation where there have been many incidents or even judicial cases brought to notice of malpractice or misconduct in connection with blood donation. Counsel have submitted none, and the court has found but one reported case based on tort arising out of blood donations, whether with or without the parties having entered into exculpatory agreements. (*Brown* v. *Shannon West Texas Memorial Hosp.,* 222 S. W. 2d 248.) No general matters affecting the health of the public or the conduct of blood donations have come to the attention of the courts or to public notice. We should

not expand public policy concepts to strike down contracts in the absence of a clear basis sustaining such a power as both judicious and constitutional. That, indeed, may be one of the differences between the legislative process and the judicial process. If there is a general condition affecting blood donation, and the condition requires safeguards, it is more properly a matter for the Legislature. A Legislature has the means and the opportunity to study the impact and ramifications of the invalidation of agreements such as urged here. Only when a condition becomes so general as to rise to common notice do the courts have a way of knowing the facts and the circumstances essential to making a valid policy determination.

Were we to hold this exculpatory agreement invalid we would not know whether it would deter or increase the donation of blood. We do not know how general is the extent of commercial blood donation. We know even less whether exculpatory agreements are obtained in commercial donation generally. Yet to hold the agreement invalid or distort it by strained interpretations is to defeat and frustrate the freedom of contract. Merely because this transaction involved blood, a matter which therefore is apt to touch us with a special emotional stimulus, cannot change the basic principles with which the problem must be approached. Otherwise our action is neither judicious nor constitutional. We have already seen that merely because transactions may affect the health of persons there is no occasion for striking down exculpatory agreements.

This is not a case similar to where the courts have struck down the agreement because of inequality in bargaining power. That principle has been emphasized most usually in the cases involving employers and employees, or public utilities. There the courts recognized what the Legislatures had recognized before them, that he who works for a wage may under normal circumstances not have a free choice as to whether he will or will not work for a particular employer or group of employers. The lack of choice in the selection of public utilities, most of them regulated monopolies, is apparent and requires no discussion. While we may presume that one does not sell his blood unless the money is desired, it does not follow that the desire is based on so urgent a need that plaintiff, or those like him, had no choice but to sign the paper handed to him and sell his blood. All we know of plaintiff is that he was regularly employed as a truck driver. Of the others who sell their blood we know less as to their status or their needs.

Should it ever appear to the courts, whether derived from common knowledge or otherwise, that those who sell their blood are in a position of helplessness, subject to any demand upon them, or otherwise substantially deprived of a free choice in making their bargains, an entirely different case will be posited. Should such a condition be brought to the attention of a legislative body, it would be difficult to believe that it would not act expeditiously, effectively, and with prospective effect alone.

There is also another side to the situation. It does not necessarily follow that an exculpatory agreement is an evil thing. Nor does it necessarily follow that one who protects himself with an exculpatory agreement is a grasping fellow.

We can understand that defendant in a case such as this may have good reason to protect itself with an exculpatory agreement. The opportunities for unjust claims would be great. The difficulties in establishing that all had been done that care required would be equally great. The accident prone, the hypochondriac, and the neurotic may often appear in transactions of this kind.

Plaintiff was a commercial blood donor. He had donated blood before to defendant. He in writing assumed all the risks of the process. He was free to do or abstain from doing. We know of no circumstance or general condition that justifies the invoking of a public policy to destroy a contract voluntarily and knowingly made between the parties. Moreover, the affidavits on the motion for summary judgment are spare in their facts and uninformative, and are not made by plaintiff, who had knowledge of the facts.

The orders denying the motion to strike the affirmative defense and granting the motion for summary judgment in favor of defendant, and the judgment dismissing the complaint should be affirmed in all respects.

PECK, P. J., and COHN, J., concur with VAN VOORHIS, J.; BREITEL, J., dissents in opinion, in which CALLAHAN, J., concurs.

Judgment and order appealed from by the plaintiff dismissing the complaint upon defendant's motion for summary judgment reversed and the said motion denied, with costs. Insofar as the order denies plaintiff's motion to strike out the defense of release or covenant not to sue, the order is affirmed, leaving the coverage and validity of the instrument to be decided after a trial, at which it can be ascertained precisely how this accident occurred. Settle order on notice.