OPINION OF THE COURT
Martin Evans, J.
This action for medical malpractice and loss of consortium arises from a kidney transplant operation performed at the New York Hospital on January 25, 1972, in which one of plaintiff Donne Colton’s kidneys was removed and implanted in the body of his brother, Dudley Colton, Jr. Prior to the operation, the brothers executed an agreement with the hospital denominated "Request for and Consent to Kidney Transplant and Covenant Not To Sue Upon and Release of All Claims”. The sole issue now before the court is the meaning and effect of the agreement.

Background

At the time of the operation, in 1972, Donne, the donor, was nearly 39 years old; his brother Dudley, Jr., the recipient, was 44. Each brother was gainfully employed, married and the father of several children.
Dudley Colton, Jr., and his family first learned that he was suffering from a degenerative kidney disease in approximately 1962. He was advised that a transplant, then an experimental procedure in an early stage of development, would be his only ultimate hope of leading a normal, healthy life. Dudley was then told that his doctors would maintain him by dialysis and other nonsurgical techniques, until such time as the transplant procedure was sufficiently developed so as to be practica *959 ble in his case. Given the need for as close a genetic match as possible so as to avoid tissue rejection, the family knew that either Donne or the brothers’ father, Dudley Colton, Sr., would be the likeliest donor.
In 1969, having been advised that Dudley’s condition had worsened, and that only a transplant could prevent his death, the family first discussed a transplant with Dr. Schwartz, a member of the transplant team at the New York Hospital. Dr. Schwartz first considered using Donne as the donor, because of his age, and the greater statistical success rate among siblings as compared to parents. Subsequent testing in 1970, however, showed that Donne had multiple renal arteries, a complicating structural anomaly, which would have necessitated the use of as yet inadequately developed surgical techniques. Donne was therefore rejected, despite his being both more compatible and a better surgical risk. Prior to undergoing the tests, and agreeing to serve as a donor, Donne consulted a urologist where he lived in Canton, Ohio. This urologist explained transplants and the attendant risks both of the operation itself and subsequent life with one kidney.
In mid-1970, a kidney transplant operation was performed at the New York Hospital between Dudley and his father. The procedure was unsuccessful due to Dudley’s body’s rejection of the transplanted organ. Prior to the operation, father and son executed a form document identical to the agreement at bar.
Around Christmas, 1970, Dr. Schwartz again contacted the Coltons. He assured Donne that after additional successful transplants, including eight involving cadavers with multiple arteries, the techniques had been sufficiently developed to make him a suitable donor, notwithstanding his anomalous renal artery structure. By this time, Dudley’s condition had substantially deteriorated. His kidneys had so thoroughly failed that only mechanical dialysis was sustaining him. Moreover, he had by this time developed a dangerous liver condition which was ultimately to cause his death. The doctors considered the liver condition so immediately life-threatening as to make him an unreasonably poor surgical risk until the liver condition could be stabilized. Thus, ironically, while Donne was now considered a suitable donor, Dudley was no longer considered a suitable recipient.
In April, 1971, the doctors persuaded Donne to re-enter the New York Hospital for preoperative testing, since they believed Dudley’s condition had improved to the point where he *960 could withstand and benefit from the operation. Along with other papers, Donne signed an agreement identical to the one at bar. The testing, however, revealed that Donne also had a liver dysfunction, resulting from excessive alcohol consumption and anxiety about the surgery. The operation was then indefinitely postponed.
In January, 1972, the brothers’ conditions had sufficiently stabilized to permit the operation. On the evening before the operation, January 24, 1978, Donne and his wife went up to Dudley’s room where, along with Dudley’s wife, they tried to cheer up Dudley, who was depressed and anxious. During the banter between the two couples, Dr. Brennan, a member of the surgical team, entered. He presented the brothers with a three-page document, the agreement at bar. The surgeon apparently explained only that signing it was a prerequisite to surgery. Donne remembers nothing about this meeting, or anything else prior to the operation, except the routine paperwork at the admissions desk. His wife remembers that she skimmed the document, realized that it was some kind of instrument limiting liability, but did not sign it. She also remembers that the brothers did sign the document but did not read it. The document reads as follows:
"THE NEW YORK HOSPITAL REQUEST FOR AND CONSENT TO KIDNEY TRANSPLANT AND COVENANT NOT TO SUE UPON AND RELEASE OF ALL CLAIMS
"whereas, Dudley Colton (the 'Recipient’), born 12/2/28 on [sic] and residing at 716 Van Nest Dr. Martinsville, N. J. has a serious kidney ailment and is in danger of losing his (her) life as a result thereof: and
"whereas, Donne Colton (the 'Donor’), born 2/18/33 on [sic] and residing at 804 Overidge Sec. Canton, Ohio is desirous of donating one of his (her) kidneys to the Recipient in order to attempt to save his (her) life: and
"whereas, certain doctors associated with The New York Hospital are willing to attempt to transplant one of the Donor’s kidneys to the Recipient in the hope of saving the Recipient’s life: and
"whereas, the said doctors, The New York Hospital and all persons connected with The New York Hospital wish to be absolved from any and all liability, damages, lawsuits and *961 causes of action arising out of or in connection with said attempted transplant.
"now, therefore, in consideration of the premises, of the performance of the attempt to transplant mentioned above and the care and treatment to be rendered in connection therewith and also in consideration of other good and valuable considerations, the receipt whereof by each party hereto from each of the others is hereby acknowledged, we, the intended Recipient of the operation, the intended Donor and the spouse or other next-of-kin of each, respectively, each being over twenty-one (21) years of age and each fully realizing that the transplant may be unsuccessful and may result in loss of life of in future physical incapacity, illness or illnesses directly or indirectly caused by said transplant, nevertheless both jointly and severally on behalf of ourselves, our heirs, administrators, executors and assigns, hereby
"request and consent that the said attempted transplant be performed and that all operations, procedures or treatment which may, in the opinion of the said doctors or The New York Hospital, be necessary or advisable be performed: and hereby
"covenant not to sue the said doctors who perform the said attempted transplant or render any care in connection therewith. The New York Hospital, any or all persons associated with it, or any other person or persons directly or indirectly connected with the said operation or the care rendered in connection therewith, upon any or all claims, damages or causes of action, either at law or in equity, which we may have or acquire or which may accrue to us, our heirs, administrators, executors or assigns as a result of the said operation, any other operations which may, in the opinion of the said doctors of The New York Hospital, be necessary or advisable, the evaluation of the health of organs, any operative procedures followed in the removal or insertion of organs, blood vessels, tissues, nerves or other substances, the administration of drugs or x-ray treatments, and pre- or post-operative care rendered in connection with any of the foregoing or as a result of other treatment given in connection with any of the foregoing.
"We intend to, and by this instrument do, release and forever discharge all persons mentioned or described in the preceding paragraph hereof of and from the claims, damages and causes of action therein set forth.
*962 "It is clearly understood by all parties to this instrument that no representations have been made to any of us regarding the success of the attempted transplant, and we fully understand that said transplant is in the nature of an experiment and is being performed in the hope of saving the life of the Recipient. We have read all the statements contained herein and we fully realize that we are signing a complete release and bar to any further claims which we may have resulting in any way from the attempted transplant or the other operations or treatments herein-above described.
"in witness whereof, we have set our hands and seals THIS 24th day of Jan. 1972 Witness-S/Dr. Lawrence Brennan Donor-S/Donne L. Colton Witness Donor’s spouse or other next-of-kin Relationship Witness-S/Dr. Lawrence Brennan Recipient-S/Dudley T. Colton Witness Recipient’s spouse or other next-of-kin Relationship.”
The actual transplant operation the following day was apparently successful, in a limited, technical sense. Dudley, the recipient, however, soon died, as a result of the pre-existing liver ailment. Donne, the donor plaintiff, did not immediately recover consciousness, but went into shock with acute renal failure and quickly developed a life-threatening, nonspecific infection with a perilously high fever. Massive doses of antibiotics, Keflin and Gentamycin, were administered. Upon finally awakening 10 days later, Donne found that he was deaf. During the time he was unconscious, a tracheatomy was performed. Donne later developed a melanoma where the tracheotomy incision was made.

Prior Proceedings

Plaintiffs commenced this action for medical malpractice and loss of consortium by service of summons and complaint dated April 30, 1974. Defendants, inter alia, interposed the affirmative defense of release, claiming that the agreement at issue effected a complete bar to plaintiffs’ action. Cross mo *963 tions to strike the defense and dismiss the complaint were made in Special Term (Fine, J.) by an order entered on December 2, 1975, denied the motions, holding that the validity of the document as a release was to be determined at trial. The Appellate Division by decision dated June 24, 1976 (53 AD2d 576) modified the decision below, holding that the document’s "meaning and effect in law” were to be decided at a pretrial hearing. The parties subsequently held several depositions and stipulated that the court was to resolve the matter at bar based on their submissions and the record of the examinations before trial.

The Distinction Between a Release and a Covenant Not to Sue

The defendant contends that the agreement in question is a release which operates as a complete bar to plaintiffs’ suit. Plaintiffs assert that the instrument does not relieve defendants from liability for their own negligence. Plaintiffs further argue that the agreement is void as against public policy.
In its opinion remanding the agreement’s construction to this court, the Appellate Division observed: "[I]n general terms a covenant not to sue is an agreement by one having a present right of action against another not to sue to enforce such right. A covenant not to sue is not a release since it is not a present abandonment of a right or claim, but merely an agreement not to enforce an existing cause of action. Such a distinction, although technical is nevertheless clear. Thus, the party possessing the right of action is not precluded thereby from thereafter bringing suit; however, he may be compelled to respond in damages for breach of the covenant.” (Colton v New York Hosp., 53 AD2d 588, 589.)
The accepted "black-letter” definition (Black’s Law Dictionary [3d ed], p 472) is not sufficiently precise for either formally classifying this argeement or construing its effect. The generally abstrusely worded distinction has been further obfuscated by several factors. First, there is a frequent tendency to genetically group all agreements relieving a party from liability under the broad term "release”. (E.g., Ann., 6 ALR3d 704; Boll v Sharpe & Dohme, 281 App Div 568, 569.) Second, an agreement, like the one at bar, may recite language of the traditional release, and may be denominated as such, although it may in fact be a covenant not to sue. (E.g., Wolinsky v Queens Beauty Inst., 56 Misc 2d 596, affd without *964 opn 59 Misc 2d 246; Phibbs v Pay’s Chevrolet Corp., 45 AD2d 897.)
Third, especially in serious personal injury and wrongful death cases involving joint tort-feasors, the courts have often strained the formal distinctions in order to avoid an unjust result. The ancient common law imposed a harsh consequence on the party giving a release to a joint tort-feasor — it held him forever barred from suing any other joint tort-feasors. In contrast, one who executed a covenant not to sue would not have been so barred. The New York courts very early ameliorated the harshness of the common-law distinction. They held that an instrument releasing one tort-feasor, but expressly reserving the releasor’s right to proceed against the others, would be deemed to be a covenant not to sue. (Gilbert v Finch, 173 NY 455.) The purpose of this construction (as, of course, that of all contract law) was to honor the clear intention of the parties. (2 Williston, Contracts [3d ed], § 338A, pp 722-723; Plath v Justus, 28 NY2d 16.) This construction, intended to promote a just result, also unwittingly confused the conceptual distinction between a covenant not to sue and a release. Such is often the by-product of result orientation. While the spirit of the law may necessarily take precedence over its form, it is far preferable to advance its spirit while respecting its form. The proper approach is to hold, as we hold here, that a covenant not to sue and a release are both contracts governed by the same principle of contract law, the intention of the parties. This principle is not well served by stretching and chopping categories on the procrustean bed of conventionally accepted legal form. The parties’ intention does not mechanically transform a release into a covenant, or a covenant into a release. Rather, it is the parties’ intention, in and of itself, which should define the document’s scope (i.e., which acts, by which parties are thereby rendered inactionable). (See, in accord, General Obligations Law, § 15-108, adopted 1972.)
Fourth, other cases construing agreements prospectively limiting liability, i.e., covenants not to sue, have avoided making the distinction at all. Instead, they have increased the confusion by employing a plethora of terms having little independent significance, e.g., "exculpatory agreement”, perhaps the most accurately descriptive (Tunkl v Regents of Univ. of Cal., 60 Cal 2d 92); "exculpatory clause” (Ciofalo v Vic Tanney Gyms, 13 AD2d 702, affd 10 NY2d 294); "exemption clause” (Emery v Rochester Tel. Corp., 156 Misc 562, affd *965 without opn 246 App Div 787); "agreement limiting liability” (Van Dyke Prods, v Eastman Kodak Co., 16 AD2d 366, affd 12 NY2d 301); "immunity clause” (Kirshenbaum v General Outdoor Adv. Co., 258 NY 489); or simply, "agreement” (Howard v Handler Bros. & Winell, 279 App Div 72).
Finally, perhaps the most important difference between a covenant not to sue and a release — the effectiveness of the agreement as a bar to a subsequent action by a breaching promisor — has long been recognized as being invariably a distinction without a difference. Since equity would not permit specific performance of a covenant not to sue, an action would lie for its breach. The measure of the aggrieved promisee’s damages, however, would, except for attorney’s fees, be equal to his original liability on the underlying claim. Thus, in order to prevent a circuity of actions, where a covenant not to sue was given in perpetuity and did not involve joint tort-feasors, it would be deemed to operate as a release, a complete and permanent bar to the underlying action. (Simpson, Contracts [2d ed], p 291.)
What then, is the conceptual distinction which differentiates a release from a covenant not to sue? A release is retrospective; a covenant not to sue, like any other covenant, is prospective. A release discharges an existing obligation or cause of action. The consideration for the release acts as a substitute for performance under the prior obligation; the obligation, thus satisfied, is extinguished and a cause of action can therefore no longer exist. (15 Williston, Contracts [3d ed], § 1820; 5A Corbin, Contracts, § 1238.)
The most obvious example is that of the release given in exchange for the compromised settlement of an action or preexisting claim, which completely discharges the cause of action. (See Murray v Narwood, 192 NY 172; Fleming v Ponziani, 24 NY2d 105; Malvica v Blumenfeld, 28 NY2d 851.)
Viewed a bit differently, a release is an executed agreement. No further performance is necessary. (Calamari & Perillo, Contracts [2d ed], p. 772.) A covenant not to sue, however, is executory. The performance it demands is continuous and prospective either permanently or for a limited, stated period of time. The performance, of course, is the obligor’s future forbearance in asserting a claim which exists or may accrue against the obligee. (Wilder v Penn. R. R. Co., 245 NY 36; Boll v Sharpe & Dohme, 281 App Div 568, supra; Howard v Handler Bros. & Winell, supra.) As Judge Crane, speaking for *966 a unanimous Court of Appeals, declared in Wilder (p 39): "The pass had none of the elements of a release. It was an agreement not to sue * * *. There was no claim in existence to be released at the time it was given. It spoke for the future, not the present or the past. No liability existed, consequently there was none to be released.”
In the instant case, no claim was in existence at the time the agreement was executed. At best, a possible right of action was in contemplation at the time the agreement was executed. Furthermore, it is of no moment that the title of the agreement included the word "release”, and the text recited the familiar litany, "release and forever discharge”. The language here is substantially identical with that in Boll (supra), where plaintiff agreed to "release and discharge * * * all claims and demands”. The court held that, under the rule of ejusdem generis, the clause adds nothing on its own, but either is deemed to refer only to those matters more specifically described beforehand in the instrument. (Boll, supra, p 572; Kaufman v American Youth Hostels, 13 Misc 2d 8, mod 6 AD2d 223, mod 5 NY2d 1016.)
The court therefore holds that the agreement at bar is a covenant not to sue, notwithstanding its use of traditional words of release.

The Ambit of the Covenant Not to Sue

Having classified the document, we must now determine the extent of its reach. Does it include negligence and medical malpractice as defendants claim?
Is it void in its entirety on public policy grounds, as plaintiffs claim? These questions must both be answered in the negative. They will be addressed ad seriatim.
As a general proposition, the law permits parties to contract freely, provided that neither the subject matter, the bargaining process, nor the manner of performance unduly impinges on an overriding public policy. Forbearance from asserting a cause of action can be a proper subject on which parties may contract; and as long as the public interest is not involved, bargaining power is equal, and the parties’ intention is clearly and unequivocally expressed, a promisor may prospectively agree to exempt a promisee from liability occasioned by the promisor’s own negligence. (Howard v Handler Bros. & Winell, supra; Ciofalo v Vic Tanney Gyms, supra.)
*967 Thus, the New York courts have consistently held that covenants not to sue could permissibly encompass negligence in cases involving drag-strip racing (Solodar v Watkins Glen Grand Prix Corp., 36 AD2d 552); mountain climbing (Kaufman v American Youth Hostels, supra); membership in a yacht club (Hertzog v Harrison Is. Shores, 21 AD2d 859); or health club (Ciofalo, supra); or treatment by a student at a hairdressers’ school (Wolinsky v Queens Beauty Inst., 56 Misc 2d 596, affd without opn 59 Misc 2d 246, supra). Each of these cases concerned purely voluntary activity by the promisor and involved no relationship or activity affected by a public interest. All were activities which could be considered societally insignificant. Some had obviously high risks. (The drag-strip situation is actually susceptible to traditional assumption of risk analysis, given the degree of knowledge and control of the injured promisor).
Similarly, the courts have permitted such covenants to embrace negligence in cases involving commercial leases (Kirshenbaum v General Outdoor Adv. Co., 258 NY 489, supra) and commercial barge towing not involving a common carrier (Graves v Davis, 235 NY 315). These cases concerned societally not insignificant subject matter, but did not involve members of the public or any disparity in bargaining power. Related to these cases are the so-called "contractor cases” which validate indemnification clauses whereby the promisor agrees to indemnify the promisee for any liability to third parties resulting from the promisee’s negligence. (Kurek v Port Chester Housing Auth., 18 NY2d 450; Levine v Shell Oil Co., 28 NY2d 205.)
The "contractor cases”, however, are based on a different relationship and are motivated by a different purpose than the covenant at bar. The agreements in the "contractor cases” envisage a situation where the promisor and promisee are both joint tort-feasors or are in an "active-passive relationship” and not one where the promisor is a victim of the promisee’s negligence. Thus, the indemnification agreement is valid since (1) no public policy is violated by consensually and prospectively allocating responsibility among tort-feasors inter se; and (2) public policy of compensating innocent victims is thereby facilitated.
Thus, while a covenant not to sue may permissibly embrace negligence, it must be strictly construed against the party asserting it. Moreover, its wording must be "clear and une *968 quivocal”. (Kaufman v American Youth Hostels, supra; 17 CJS, Contracts, § 262.)
"[Limitations of liability in such agreements [must] be explicit and sufficiently simple that a running reading would reveal a clear meaning” (Rappaport v Phil Gottlieb — Sattler, Inc., 280 App Div 424, 426, affd 305 NY 594).
The covenant at bar does not specifically enumerate negligence or malpractice; neither does a "running reading” of the three-page form document convey that impression.
The rationale for this holding can be seen more clearly from a slightly different perspective. It is axiomatic that the scope of a contract is defined by the intention of the parties, i.e., the "meeting of the minds”.
The law looks with favor on freely allowing persons to contract, thereby allowing the parties to voluntarily order their own relationship where no overriding public interest is involved. The courts must therefore resolve disagreements over a contract’s meaning by examining the intent of the parties. (See Plath, 28 NY2d 16, supra; 2 Williston, Contracts [3d ed], § 338A.) Parties are held to have intended that which they wrote. (Laba v Carey, 29 NY2d 302.) This fundamental rule of construction is particularly important in contracts such as the covenant at bar which involve the permanent relinquishment of a right as important as that of legal recourse. Thus, since the covenant neither specifically enumerates negligence, nor contains any other language which could relate to it, the court can only presume that the parties intended that negligence not be included. Furthermore, the record before the court clearly indicates that the intention of the defendants in offering the covenant, and that of the plaintiffs in accepting it, was that the nephrectomy be performed according to the standard of accepted medical practice for such an operation.
A kidney transplant in 1972 was concededly an experimental operation, having the obvious risks of tissue rejection, shock, and possibly death — indeed, even if it were performed according to the highest standards of the state of the art as then known. Despite the inherent risk, the Legislature had enacted a statute declaring that the State’s public policy favored such transplant programs, in view of the high mortality from kidney disease in New York. (Public Health Law, § 2710.) The various State and Federal Governments support *969 kidney and other experimental medical research programs by substantial financial subsidies.
The court must therefore strike a balance between conflicting but interrelated societal interests if any of these important interests is to be advanced. A public policy encouraging such necessary activity as experimental medical research would be utterly ineffectual if one who performs the activity may be held liable solely on account of his nonnegligent performance. A patient’s opportunity to be aided by innovative technology presupposes the availability of willing physicians unafraid to use it.
Moreover, plaintiff was a voluntary subject of the operation. Plaintiff was healthy, not ill. He was not compelled by either physical necessity or legal obligation to donate one of his kidneys. Of course, plaintiff’s action was neither frivolous nor unreasonable; it was prompted by a commendable sense of familial compassion and moral duty. In that regard, it resembles the "rescue” doctrine. (See Wagner v International Ry. Co., 232 NY 176.) The rescue doctrine, however, was intended to apply to spontaneous reflexive acts occasioned by a tortfeasor’s own tortious action. In the case at bar, neither the doctors nor the hospital was responsible for Dudley’s perilous condition. Moreover, Donne’s decision to donate his kidney was the product of years of discussion and deliberation, not the automatic, split-second response contemplated by the rescue doctrine.

Conclusion

As a general proposition, doctors and their patients may execute covenants not to sue and releases. Such is the assumption of the courts and the Legislature. (See, e.g., Malvica v Blumenfeld, 28 NY2d 851; Colton v New York Hosp., 53 AD2d 588, supra; cf. General Obligations Law, §§ 5-321 — 5-326, statutory prohibitions of contractual exemptions of liability for negligence involving lessors, caterers, building maintenance contractors, garages and gymnasiums.)
Specifically, where a patient voluntarily agrees to undergo an experimental and inherently dangerous surgical procedure, the parties may covenant to exempt the physician from liability for those injuries which are found to be the consequences of the nonnegligent, proper performance of the procedure. We hold that the agreement in question was intended to promote that end, and therefore legally bars suit on such consequences. *970 That is to say, that an experimental procedure which, because of its inherent dangers, may ordinarily be in and of itself a departure from customary and accepted practice (and thus possibly actionable as malpractice) even if performed in a nonnegligent manner, may be rendered unactionable by a covenant not to sue.
The inherent dangers of an experimental procedure include the reasonably foreseeable possibility that untoward consequences may occur. Some consequences (e.g., tissue rejection and shock, in transplant situations) are so well known as to be reasonably expected. Others (e.g., deafness stemming from an adverse reaction to antibiotic medication given to treat a nonspecific infection, and a melanoma which later developed at the site of a tracheotomy incision) may have been unexpected. Whether or not a given injury was expected, or even foreseeable, is not an issue, for the trier of the facts. Rather any injury, whether foreseeable or not, is barred by the covenant, provided that it is a consequence of the nonnegligent performance of the procedure.
Such questions of negligence and causation are issues of fact which must be decided at trial. As a general proposition, the trier of the facts should be permitted to decide (1) whether the experimental procedure was performed nonnegligently; and (2) whether a given injury would not have occurred but for the nonnegligent performance of the procedure. If each question is answered in the affirmative, the covenant would bar an action on such injury. If, however, the jury were to find that a given injury was caused by negligence, either in the performance of the procedure, or otherwise, the action as to that injury would not be barred by the covenant.
Finally, there has been no showing of fraud in the execution on the part of the defendants. The issue of defendant’s alleged failure to obtain plaintiff’s informed consent was raised as part of a cause of action denominated as one for negligent advice and treatment. It is more accurately one for battery since it alleges that the procedure itself was conducted without adequate consent. The record before the court clearly belies this claim. Over a 10-year span, Donne and his family were advised by numerous medical specialists who explained the mechanics of the procedure and its risks. They continuously discussed it among themselves. The agreement itself warned of dangers (e.g., death, physical incapacity and illness), and was identical in wording to that signed once before by *971 Donne and twice before by his brother. Thus, the covenant would bar a cause of action for battery, since it was the parties’ manifest intent that the operation take place. (See Wolinsky, 56 Misc 2d 596, supra; Prosser, Torts [4th ed], § 101 et seq.)
The agreement of course cannot be held to bar plaintiff wife’s claims, since she did not sign it. Insofar as her claims are derivative, however* they are delimited by Donne’s claims, which are in turn delimited by the agreement.