ARTHUR ASH et al., Appellants, v NEW YORK UNIVERSITY DENTAL CENTER et al., Respondents.

First Department, December 27, 1990

**APPEARANCES OF COUNSEL**

*Steven DiJoseph* of counsel *(Barry Salzman* with him on the

brief; *Kramer, Dillof, Tessel, Duffy & Moore,* and *DiJoseph & Gluck,* attorneys), for appellants.

*Howard R. Cohen* of counsel *(Robert S. Melnick* with him on the brief; *Bower & Gardner,* attorneys), for respondents.

## OPINION OF THE COURT

ELLERIN, J.

The issue before us in this dental malpractice action is the validity of an agreement that plaintiff Arthur Ash was required to sign as a precondition to obtaining treatment at defendant New York University Dental Center which prospectively exculpated the various defendants from any liability for negligence in treating plaintiff.

Plaintiff seeks to recover for injuries suffered as a result of his aspiration, during dental treatment, of two dental crowns, which became lodged in his right lung and required surgical removal. Plaintiff had previously been a private dental patient of defendant Dr. Charles Lennon. In 1986, while under Dr. Lennon's care, plaintiff was informed that he required substantial dental work which would cost over $6,000. When plaintiff indicated that he could not afford such a fee, Dr. Lennon recommended that plaintiff obtain services at New York University Dental Center, where the work could be done for $3,000. Lennon advised plaintiff that other dentists, including students and postgraduate students, worked at the clinic, but that he, Dr. Lennon, who served as an instructor at the school, would oversee all work and would try to be present when plaintiff received treatment.

When plaintiff arrived at the clinic on October 15, 1986 to register prior to receiving treatment, he was required to sign a form containing the following provision: "In consideration of the reduced rates given to me by New York University, and in recognition of the risks inherent in a clinical program involving treatment by students, I hereby release and agree to save harmless New York University, its trustees, doctors, employees and students from any and all liability, including liability for its and their negligence, arising out of or in connection with any personal injuries (including death) or other damages of any kind which I may sustain while on its premises or as a result of any treatment at its Dental Center or infirmaries."

At his deposition, plaintiff testified that he believed the signing of this form was an insignificant registration procedure and he was never told, nor did he imagine, that he was

relinquishing any of his legal rights. He was not offered an option of paying an additional fee rather than agreeing to this provision. Thereafter, plaintiff began periodic visits to the clinic to receive treatment. On April 6, 1987, while he was being treated by Dr. Lennon and by defendant Dr. Prestipino, a postgraduate dental student, the alleged malpractice occurred.

After commencement of the instant action and the completion of discovery, defendants moved for summary judgment based on the affirmative defense of waiver and release by reason of the form signed by plaintiff. Plaintiff asserted, *inter alia,* that enforcement of the agreement would be violative of public policy. Although the motion court stated on the record that it had "serious questions about the release", it granted the defendants' motion on constraint of this court's affirmance without opinion in *Morabito v New York Univ. Dental Center* (104 AD2d 1064). There is no decision of the Court of Appeals that expressly deals with this precise issue.

It does not appear that this court has ever previously undertaken to fully analyze the public policy ramifications of a covenant not to sue for future negligence in the context of medical or dental malpractice. Upon such analysis we conclude that the agreement in this case is in violation of public policy and should not be enforced. To the extent that it holds to the contrary, we decline to follow the holding in *Morabito v New York Univ. Dental Center (supra).*

Our analysis begins with the long-settled general proposition that the law frowns upon an agreement intended to exculpate a party from the consequences of its own negligence and requires that such contracts be subjected to close judicial scrutiny *(Gross v Sweet,* 49 NY2d 102). Because exculpation provisions are not favored by the law, they are strictly construed against the party relying on them and must be unambiguously expressed in unmistakable language that is clear and explicit in communicating the intention to absolve from negligence the party seeking to be insulated from liability. *(Gross v Sweet, supra; Ciofalo v Vic Tanney Gyms,* 10 NY2d 294; *Boll v Sharp & Dohme,* 281 App Div 568, *affd* 307 NY 646.) Judicial scrutiny of such provisions has frequently, as a threshold issue, focused upon the scope and sufficiency of the language of the particular exculpatory clause involved, including some between health care providers and their patients, and upon finding the subject clause unenforceable by reason of its failure to express an intent to exculpate with sufficient

specificity or clarity, exploration of other considerations bearing on the validity of the clause has been unnecessary. *(See, e.g., Gross v Sweet, supra; Abramowitz v New York Univ. Dental Center,* 110 AD2d 343; *Boll v Sharp & Dohme,* 281 App Div 568, *appeal dismissed* 306 NY 669, *affd* 307 NY 646, *supra; Valenti v Prudden,* 58 AD2d 945; *DeVito v New York Univ. Coll. of Dentistry,* 145 Misc 2d 144; *but see, Black v New York Univ.,* NYLJ, Mar. 6, 1985, at 6, col 1; *Fearns v Columbia Univ. School of Dental & Oral Hygiene,* NYLJ, May 15, 1979, at 10, col 5.) Parenthetically, it may be noted that agreements which purport to grant exemption for liability for gross negligence or deliberate misconduct, no matter how explicitly expressed, are wholly void. *(Gross v Sweet, supra.)*

Significantly, it has been held that even an agreement that clearly and unambiguously attempts to exempt a party only from liability for ordinary negligence will not be enforced by the courts of this State, if it is found to violate public policy either by way of conflicting with an overriding public interest or because it constitutes an abuse of a special relationship between the parties, or both. *(See, Ciofalo v Vic Tanney Gyms,* 10 NY2d 294, *supra.)* Examples of special relationships of parties between whom such agreements have been found by the courts to be void include employers and their employees *(Johnston v Fargo,* 184 NY 379) and common carriers and their passengers *(Conklin v Canadian-Colonial Airways,* 266 NY 244). On the other hand, the courts have permitted exculpatory agreements in other contexts. For example, an agreement between a burglar alarm contractor and its customer was upheld in *Florence v Merchants Cent. Alarm Co.* (51 NY2d 793), where the court relied on the fact that the agreement was entered into in a commercial setting and expressly noted that there was no special relationship between the parties. *(See also, Kalisch-Jarcho, Inc. v City of New York,* 58 NY2d 377.)

In the instant case, we find that the exculpatory agreement sought to be enforced, between a dental clinic and its patient, implicates both the State's interest in the health and welfare of its citizens, as well as the special relationship between physician and patient and that it would be against public policy to uphold such an agreement.

It is clear that the State's substantial interest in protecting the welfare of all of its citizens, irrespective of economic status, extends to ensuring that they be provided with health care in a safe and professional manner. Toward that end, the

State carefully regulates the licensing of physicians and other health care professionals and monitors such activities to prevent untoward consequences to the public from "the ministrations of incompetent, incapable, ignorant persons". *(People ex rel. Bennett v Laman,* 277 NY 368, 381.) A similar concern for the enforcement of established minimum standards of professional care provides the underlying rationale for a cause of action for malpractice in favor of those who have been subjected to substandard care. *(See, Pike v Honsinger,* 155 NY 201.)* Unquestionably public clinics such as defendant, which are used primarily by those who are unable to pay the rapidly escalating fees for private medical and dental care, play an important role in delivery of such care to those who may not otherwise be able to obtain it. However, important as this role is, it cannot serve as a basis for excusing such providers from complying with those minimum professional standards of care which the State has seen fit to establish. It is the very importance of such clinics to the people who use them that would create an invidious result if the exculpatory clause in issue were upheld—i.e., a de facto system in which the medical services received by the less affluent are permitted to be governed by lesser minimal standards of care and skill than that received by other segments of society.

There is, of course, no public policy against allowing patients of such clinics to agree to fewer amenities, longer waits or greater inconvenience in exchange for lower prices than they would pay elsewhere. Nor is there any public policy against such a clinic limiting itself to certain types of care or refusing to perform certain procedures. There cannot, however, be any justification for a policy which sanctions an agreement which negates the minimal standards of professional care which have been carefully forged by State regulations and imposed by law. As the Court of Appeals long ago stated in refusing to enforce a similar clause in the context of the relationship between an employer and employee: "That freedom of contract may be said to be affected by the denial of the right to make such agreements, is met by the answer that the restriction is but a salutary one, which organized society exacts for the surer protection of its members. While it is true that the individual may be the one, who, directly, is interested in the making of such a contract, indirectly, the state, being concerned for the welfare of all its members, is interested in the maintenance of the rule of liability and in its enforcement by the courts." *(Johnston v Fargo,* 184 NY 379, 385, *supra.)*

The fact that defendant New York University Dental Center is a clinical program associated with an educational institution does not alter this conclusion. Defendant, of course, has a substantial interest in providing its students with clinical experience as part of their education. However, this interest cannot negate the State's overriding concern in seeing that defendants fulfill their equally important obligation to their patients. That obligation includes ensuring that students are sufficiently prepared and supervised so that the treatment which is provided to human patients is at least at the minimally acceptable reasonable level of skill and care. If defendants cannot fulfill this obligation, they must not hold themselves out as being providers of dental care.

The public policy considerations here are buttressed by the independent obligations owed by defendants to plaintiff arising from the physician-patient relationship between them. This relationship imposes upon the health care provider greater responsibilities than that required in the ordinary commercial marketplace. In the context of that professional relationship "a provision avoiding liability is peculiarly obnoxious." (15 Williston, Contracts § 1751 [3d ed 1972].)

Also significant in evaluating the provision's validity are the unequal positions of the parties entering into this agreement, creating a substantial opportunity for abuse. Inequality of bargaining position, where one party "must either accept what is offered or be deprived of the advantages of the relation", has long been recognized as one of the most important aspects of the type of relationship in which an exculpatory agreement is improper. (Ibid.; 79 NY Jur 2d, Negligence, § 6.) Where exculpatory agreements have been upheld, they have frequently been negotiated either in a commercial setting (see, e.g., Kalisch-Jarcho, Inc. v City of New York, supra; Florence v Merchants Cent. Alarm Co., supra) or involved activities such as membership in a private gymnasium (Ciofalo v Vic Tanney Gyms, 10 NY2d 294, supra) or participation in drag-strip racing (Solodar v Watkins Glen Grand Prix Corp., 36 AD2d 552), all voluntary nonessential social activities freely entered into by both contracting parties. (But see, General Obligations Law § 5-326, which has overruled many of the latter group of cases.)

The case at hand presents a very different situation. Because of the crucial importance of clinics, such as defendant, to the population which they serve, their patients cannot be

considered to have freely bargained for a substandard level of care in exchange for a financial savings. Rather, they, including the plaintiff herein, use such services because they are the only ones which they can afford. This necessity renders illusory a patient's supposed freely given consent to absolve of liability for negligence those from whom he or she seeks treatment. Thus, even aside from the deleterious effect which a decision upholding such an agreement could have on the public-at-large, the individual responsibility bestowed upon defendants by the physician-patient relationship, in the context of the disadvantageous position from which plaintiff necessarily entered into the agreement, militates strongly against its propriety.

Defendant argues that we may not invalidate this agreement because the Legislature has specifically acted to proscribe such agreements in particular instances, thereby evincing an intent to foreclose the courts from acting with respect to such agreements in other contexts. However, these statutes (e.g., General Obligations Law § 5-321 [landlords], § 5-322 [caterers], § 5-323 [service or maintenance contractors], § 5-325 [garages and parking places], § 5-326 [pools, gymnasiums, and places of public amusement or recreation]) were enacted in a piecemeal fashion, and, as one observer has noted, frequently in apparent response to particular problems as they arose (see Brook, *Contractual Disclaimer and Limitation of Liability under the Law of New York,* 49 Brooklyn L Rev 1). There has never been any indication of a legislative intent to create a comprehensive scheme foreclosing the courts from evaluating the propriety of exculpatory agreements which the Legislature has not addressed, particularly in an area involving licensed regulated professions with standards of care imposed by law. (See, *People ex rel. Bennett v Laman, supra; Boll v Sharp & Dohme, supra,* 281 App Div, at 574 [Breitel, J., dissenting].)

Other jurisdictions which have addressed attempts by health care professionals to relieve themselves of liability, particularly to those who stand in a disadvantageous bargaining position, have arrived at a conclusion similar to the one we have reached.

In *Emory Univ. v Porubiansky* (248 Ga 391, 393-394, 282 SE2d 903, 905), the Supreme Court of Georgia refused to enforce a very similar contract in a setting identical to the one herein, stating: "A contract between a medical practitioner and patient must be examined in light of the strong policy of the state to protect the health of its citizens and to

regulate those professionals that it licenses. It is this strong interest of the state in the health and health care of its citizens which gives the state the right to regulate the health professional. * * * 'The right to practice medicine is a conditional right which is subordinate to the state's power and duty to safeguard the public health, and it is the universal rule that in the performance of such duty and in the exercise of such power, the state may regulate and control the practice of medicine and those who engage therein' ".

In *Tunkl v Regents of Univ.* (60 Cal 2d 92, 98-101, 32 Cal Rptr 33, 37-38, 383 P2d 441, 445-446), the Supreme Court of California identified several characteristics helpful in determining if an exculpatory agreement is in violation of public policy as follows: "It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." While the court in *Tunkl* noted that all of these factors need not be present in every case it found that in that case, which involved a charity hospital, a facility similar to the one here in issue, all of the factors were present.

These identifying factors were also adopted by the Supreme Court of Tennessee in *Olson v Molzen* (558 SW2d 429) where an exculpatory agreement signed by a patient at an abortion clinic was held to be void. That court aptly noted that the rule that a party may contract against his or her own negligence: "d[oes] not afford a satisfactory solution in a case involving a professional person operating in an area of public interest and pursuing a profession subject to licensure by the state. The

rules that govern tradesmen in the market place are of little relevancy in dealing with professional persons who hold themselves out as experts and whose practice is regulated by the state" *(supra,* at 430).

In *Meiman v Rehabilitation Center* (444 SW2d 78, 80), the Court of Appeals of Kentucky similarly expressed its disapproval of an exculpatory agreement signed by a physical therapy patient who was then subjected to allegedly negligent treatment. That court, relying upon an Annotation entitled *Validity and Construction of Contract Exempting Hospital or Doctor From Liability For Negligence to Patient* (6 ALR3d 704, 705), stated that: "in some instances such an agreement may be valid, but that in no event can such an exculpatory agreement be upheld where either '(1) the interest of the public requires the performance of such duties, or (2) because the parties do not stand upon a footing of equality, the weaker party is compelled to submit to the stipulation' " *(supra,* 444 SW2d, at 80).

We are in full agreement with the foregoing conclusions and analyses which are consistent with the majority view in this country (6 ALR3d, *op. cit.,* at 705) that an exculpatory clause of the type here in issue must be held invalid as a matter of public policy.

Accordingly, the order of the Supreme Court, New York County (Ira Gammerman, J.), entered May 23, 1989, which granted the defendant's motion for summary judgment dismissing the complaint, should be reversed, on the law, and the complaint reinstated, without costs.

MURPHY, P. J., CARRO and MILONAS, JJ., concur.

Order, Supreme Court, New York County, entered on May 23, 1989, reversed, on the law, and the complaint reinstated, without costs and without disbursements.