# STATE OF MICHIGAN

# COURT OF APPEALS

---

ALTMAN MANAGEMENT COMPANY,

        Plaintiff-Appellant,

v

AON RISK INSURANCE SERVICES WEST,
INC.,

        Defendant-Appellee.

UNPUBLISHED
September 20, 2016

No. 328593
Ingham Circuit Court
LC No. 13-001106-CK

---

Before: JANSEN, P.J., and K. F. KELLY and O'BRIEN, JJ.

PER CURIAM.

Plaintiff-appellant, Altman Management Company (Altman), appeals as of right an order granting involuntary dismissal in favor of defendant-appellee, AON Risk Insurance Services West, Inc. (AON), in Altman's breach of contract and negligence claim against AON. Finding no errors warranting relief, we affirm.

## I. BASIC FACTS

Altman owns and operates a number of properties in several states. AON is an insurance brokerage firm that contracted with Altman to procure, update, and manage Altman's insurance needs. This case arises from AON's alleged failure to properly handle a claim (the Otero lawsuit), which resulted in a default judgment against Altman.

Timothy Peterson, Altman's CFO, testified that AON was selected to serve Altman's needs because AON was "the industry leader, the gold standard . . .the white-glove service." Of particularly appeal to Peterson was the fact that AON would manage Altman's complex insurance needs and provide a "one-stop-shop" and one primary advocate – AON account executive Mike Rosenbach. Derek Lubsen was head of asset management at Altman and reported directly to Peterson. Like Peterson, Lubsen considered Rosenbach his "point person" at AON. Rosenbach acknowledged that he was responsible for Altman's account but that the responsibility primarily involved assigning tasks, not receiving and submitting claims to Altman's insurers. Instead, Rosenbach had designated claim consultant Diane Gerometta and later Wayne Brinkman to handle Altman's needs.

Altman had no written procedure in place when it came to receiving and handling claims. However, as a general rule, if there was an incident on any of Altman's properties, the property manager would forward an incident report to administrative assistant Marisa Crescenzi. Crescenzi would then put together a file and submit the matter for insurance review. All incident

-1-

reports were submitted, regardless of whether a claim was forthcoming. Importantly, Crescenzi did not handle lawsuits. If a lawsuit was filed against Altman, the matter was generally handled by Judi Mann. Crescenzi would only prepare a file and log progress of lawsuits at Mann's behest. For a few years Crescenzi forwarded incident reports directly to Westrope, an insurance wholesaler. However, after one incident report lacked the proper documentation, Westrope insisted that, going forward, Altman first submit the reports to AON, who would then forward the claim to Westrope.

In January 2010 Carmen Otero was found unresponsive at an Altman property in Detroit. In June 2011, her estate sued Altman, claiming that Otero had suffered carbon monoxide poisoning. When the resident agent for Altman received the lawsuit, she forwarded it to Peterson. Peterson then forwarded it to Lubsen and Mann and asked that the insurer be notified. Lubsen immediately forwarded the matter to Rosenbach at AON with a request that Rosenbach get with him about who would be handling the case. Lubsen did not include Brinkman, AON's claims consultant on the email. Nor did Lubsen follow-up with Rosenbach. Rosenbach testified that he never saw the email and took no action on Altman's behalf. A default was entered against Altman on July 25, 2011 after Altman failed to respond to Otero's complaint. Altman realized that the matter had been overlooked when it was served with a motion for default judgment. When Crescenzi found out about it, she immediately forwarded the matter to Brinkman, indicating, "This one fell through the cracks and an incident report was never filed and I was not copied on the correspondence so unfortunately it was never submitted to you." Altman's motion to set aside the default was denied. Altman and Otero entered into an arbitration agreement and Altman was ordered to pay the estate $3.5 million.

Thereafter, Altman sued AON for both breach of contract and negligence. Altman maintained that AON's failure to properly submit the Otero matter to Altman's insurer had resulted in the $3.5 million judgment. AON contended that, by virtue of the parties' Compensation Agreement, it had no contractual obligation to report claims for or on behalf of Altman. This agreement, which covered the period in which the Otero claim was made, specifically disclaimed any responsibility for reporting Altman's claims to Altman's insurance carriers. Nevertheless, Altman contended that the parties modified this agreement through their course of conduct. Specifically, Altman alleged that AON had always undertaken reporting claims to Altman's insurers and that AON's failure to do so in the Otero case resulted in significant loss to Altman. At issue during trial, therefore, was how claims were handled and whether the parties had modified this agreement by their conduct and Altman's claim procedure.

Following these proofs, the trial court concluded that "there was a course of conduct whereby the parties mutually agreed to Altman's submission of claims through Aon." However, while the trial court found that the Compensation Agreement had been modified to provide that AON would notify Altman's insurance carriers, the trial court further determined that there were no firm procedures in place for Altman to report a claim to AON or for AON to receive a claim from Altman.

Having found that the contract was modified and that no particular procedure was in place, the trial court then had to turn its attention to another provision in the Compensation Agreement, which limited AON's liability:

> To the fullest extent permitted by law, [AON] shall have no liability for any claim or liability asserted by [Altman] for any loss arising by reason of, or arising out of any error or omission by [Altman] including any failure to comply

with [Altman's] duty of disclosure. Should any claim or action be brought against [AON] due to an error or omission by [Altman], [Altman] shall indemnify [AON] for all damages or losses arising from such error or omission.

At trial, Altman argued that it committed no errors. It maintained that the Otero matter was properly submitted to the "point man" at AON – Mike Rosenbach and that it was Rosenbach's failure to do anything with the information that caused Altman to default. The trial court disagreed and found that Altman made a number of errors and omissions in its handling of the Otero lawsuit. The trial court rejected Altman's claim that the errors and omissions clause did not require Altman to indemnify AON against AON'S own negligence. The trial court granted AON's motion for involuntary dismissal. Altman now appeals as of right.

## II. ANALYSIS

The trial court granted AON's motion for involuntary dismissal pursuant to MCR 2.504(B)(2). "Unlike the motion for directed verdict, . . . a motion for involuntary dismissal calls upon the trial judge to exercise his function as trier of fact, weigh the evidence, pass upon the credibility of witnesses and select between conflicting inferences." *Marderosian v Stroh Brewery Co*, 123 Mich App 719, 724; 333 NW2d 341 (1983). As such, unlike in a motion for a directed verdict a plaintiff facing a motion for involuntary dismissal "is not given the advantage of the most favorable interpretation of the evidence." *Id.*

"This Court reviews a decision to grant or deny a motion for involuntary dismissal under the clearly erroneous standard. The trial court's decision will not be overturned unless the evidence manifestly preponderates against the decision." *Phillips v Deihm*, 213 Mich App 389, 397; 541 NW2d 566 (1995). The trial court's factual findings are likewise reviewed for clear error. *Chelsea Inv Group LLC v Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). "The clear-error standard requires us to give deference to the lower court and find clear error only if we are nevertheless left with the definite and firm conviction that a mistake has been made." *Jonkers v Summit Twp*, 278 Mich App 263, 265; 747 NW2d 901 (2008) (internal quotation marks omitted).

Plaintiff's arguments on appeal also call into question the trial court's interpretation of the parties' Compensation Agreement. Contract interpretation presents a question of law, which requires de novo review. *White v Taylor Distrib Co, Inc*, 289 Mich App 731, 734; 798 NW2d 354 (2010).

Altman first argues that the trial court erred when it concluded that Altman made multiple errors and omissions in its handling of the Otero matter. We disagree.

The trial court found:

The Court finds that Altman made multiple errors and omissions in the handling of the Otero lawsuit from June 20 to July 25. Lubsen e-mailed the lawsuit to only one person at Aon. Although he asked Rosenbach to let him know who would be handling the lawsuit, Lubsen never followed through when Rosenbach did not respond. The errors and omissions are not Lubsen's alone. Mann was cc'd on the e-mail to Rosenbach. She typically handled the reporting of lawsuits. Although she informed Crescenzi to set up a file, she also did not follow through to determine any further status of the lawsuit.

-3-

The efforts to answer the interrogatories appear to have been dropped after the June 23 e-mails. Had anyone followed through with having the interrogatories answered it would have certainly revealed the breakdown in communication and that no attorney had been assigned for Altman.

Altman argues that it fulfilled its duty under the modified Compensation Agreement when Lubsen forwarded the lawsuit to AON account executive Mike Rosenbach and that the trial court erred when it concluded that Altman had any obligation beyond that to ensure that the matter was handled properly. Essentially, Altman contends that the trial court rebalanced the equities of the modified contract, thereby interfering with the parties' ability to contract. Our Supreme Court has noted:

> This approach, where judges divine the parties' reasonable expectations and then rewrite the contract accordingly, is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy. This Court has recently discussed, and reinforced, its fidelity to this understanding of contract law in *Terrien v. Zwit,* 467 Mich 56, 71, 648 NW2d 602 (2002). The notion, that free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements, is ancient and irrefutable. It draws strength from common-law roots and can be seen in our fundamental charter, the United States Constitution, where government is forbidden from impairing the contracts of citizens, art. I, § 10, cl. 1. Our own state constitutions over the years of statehood have similarly echoed this limitation on government power. It is, in short, an unmistakable and ineradicable part of the legal fabric of our society. Few have expressed the force of this venerable axiom better than the late Professor Arthur Corbin, of Yale Law School, who wrote on this topic in his definitive study of contract law, *Corbin on Contracts,* as follows:
>
>> One does not have "liberty of contract" unless organized society both forbears and enforces, forbears to penalize him for making his bargain and enforces it for him after it is made. [15 Corbin, Contracts (Interim ed.), ch. 79, § 1376, p. 17.]

[*Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51–52; 664 NW2d 776 (2003).]

The plain language of the parties' Compensation Agreement specifically disclaimed any responsibility for reporting Altman's claims to Altman's insurance carriers: "Basic claims advocacy does not include claims notification to insurers . . . it is Your responsibility to take such steps as are necessary to notify directly those insurers whose coverages may apply to any circumstances, occurrences, claims, suits, demands and losses in accordance with and as may be required by the terms and conditions of the policies placed for You under this agreement." The language could not be clearer – AON specifically contracted that it had no obligation to submit claims on Altman's behalf. Still, Altman successfully demonstrated that the parties, through their actions, had modified the Compensation Agreement. This is true because "[w]hile the freedom to contract principle is served by requiring courts to enforce unambiguous contracts according to their terms, the freedom to contract also permits parties to enter into new contracts or modify their existing agreements." *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 370–371; 666 NW2d 251 (2003). Where, as here, a party claims that a contract

-4-

has been modified through affirmative conduct, there must be "clear and convincing evidence that a contracting party, relying on the terms of the prior contract, knowingly waived enforcement of those terms," satisfying the principle of mutual asset. *Id.* at 373. It is possible "the parties' past practice is so widely acknowledged and mutually accepted that it amends the contradictory and unambiguous contract language." *Detroit Police Officers Ass'n v City of Detroit*, 452 Mich 339, 340–341; 551 NW2d 349 (1996).

There is no question that the parties, through their affirmative conduct, modified the terms of the Compensation Agreement and that AON waived its right to enforce the provision disclaiming its obligation to report claims to Altman's insurers. The evidence revealed that, at least from 2008 until 2010, Altman directly submitted claims to Westrope, with a copy to Gerometta. However, that process changed when Westrope complained to Gerometta that Altman had not included specific information needed to process a claim. Going forward, Westrope required Gerometta to submit claims on Altman's behalf. Gerometta and Brinkman consistently, routinely and repeatedly submitted Altman's claims to Altman's insurers. Even Rosenbach testified that AON's obligations to Altman included facilitating contact between Altman and Altman's' insurers and that "the process was to report it to their claims consultant." The trial court properly determined that "there was a course of conduct whereby the parties mutually agreed to Altman's submission of claims through AON."

Although pleased with this conclusion, Altman claims that it had no obligation under the modified Compensation Agreement to do anything but get the Otero claim in the hands of an AON employee. Altman cites no provision in the Compensation Agreement to support this claim, likely because under the plain terms of the contract, there was no obligation for AON to submit Altman's claims to Altman's insurers in the first place. It follows, then, that the Compensation Agreement does not provide clarity in determining the parties' duties and obligations for claims reporting. The fact that the trial court determined that the parties had modified the Compensation Agreement does not result in a clear picture of just how, exactly, Altman was to forward those claims to AON or how AON was to receive those claims.

Lubsen, Mann and Crescenzi admitted that Altman had no written procedures regarding claim submission. Crescenzi handled all incident reports, but it follows that she could not create a file when a property manager failed to submit an incident report, as happened here. Additionally, while Crescenzi kept a log of incidents and claims, both she and Mann testified that Crescenzi was generally uninvolved with lawsuits. Lubsen, Mann and Crescenzi acknowledged that Gerometta and Brinkman were their claims consultants and that most claims went through them. However, Rosenbach was also copied on the claims.

The trial court did not clearly err in concluding that there was no established procedure for Altman to report claims to AON nor was there an established procedure for AON to receive those claims from Altman. By noting Altman's various errors and omissions, the trial court was not rebalancing the equities or impairing the parties' ability to contract. The trial court properly concluded that the parties had modified the Compensation Agreement through their course of conduct and that AON was obligated to submit Altman's claims to Altman's insurers. It concluded that "Neither party had its own established procedure. If neither party had its own procedure, then it can hardly be said that there was mutual agreement to one established procedure."

Altman seems to read this to mean that, because there was no established procedure, its only obligation was to see to it that *someone* at AON received the Otero claim. There is no

dispute that Lubsen forwarded the lawsuit to Rosenbach and Rosenbach did nothing with it. If the only issue was whether Altman had sent the claim on to AON, then that would end the inquiry. However, the trial court addressed Altman's "errors and omissions," not to recreate any provision of the parties' agreement, but in the context of the liability and indemnification provision of the parties' Compensation Agreement:

> To the fullest extent permitted by law, [AON] shall have no liability for any claim or liability asserted by [Altman] for any loss arising by reason of, or arising out of any error or omission by [Altman] including any failure to comply with [Altman's] duty of disclosure. Should any claim or action be brought against [AON] due to an error or omission by [Altman], [Altman] shall indemnify [AON] for all damages or losses arising from such error or omission.

Therefore, the trial court was looking at a broader issue than simply whether Altman had, in fact, forwarded the Otero matter to AON; it had to consider whether Altman committed any errors or omissions that would trigger the foregoing provision. In short, the trial court's findings that the Compensation Agreement had been modified and that there was no specific claims procedure were relevant to whether the contract had been modified but were not dispositive of whether Altman acted without error or omission.

Altman's errors and omissions were many. Lubsen forwarded the lawsuit only to Rosenbach and other Altman employees, even though Lubsen knew that Wayne Brinkman was the AON claims consultant. And, even though Lubsen specifically asked Rosenbach to acknowledge receipt and send further information, Lubsen never followed up when Rosenbach failed to respond. Altman admittedly had no written procedure for any internal or external claims reporting. Property managers were encouraged to create incident reports for all matters great and small, but the property manager failed to create an incident report when Ms. Otero was found non-responsive in her apartment. Had an incident report been submitted, Crescenzi would have forwarded it to Brinkman at AON. Because there was no incident report, Crescenzi did not create a file and had nothing to submit. It was not until after Mann received notice of the lawsuit that Crescenzi created a file, but Crescenzi's involvement with lawsuits was limited. She had no reason to submit the matter to Brinkman, thinking it was already being handled by Mann. Mann and French then attempted to answer interrogatories instead of ensuring that an attorney had been appointed and would handle such discovery going forward. In fact, Mann did not keep track of the Otero lawsuit by logging any deadlines.

Altman cites *Walters v O'Keefe*, 377 Mich 37; 138 NW2d 751 (1966), *Federspiel v Bourassa*, 151 Mich App 656; 391 NW2d 431 (1986), and *Shawl v Spence Bros, Inc*, 280 Mich App 213; 760 NW2d 674 (2008) for the idea that Altman was under no duty to follow up with AON after the Otero lawsuit was forwarded to Rosenbach. But Altman fails to see that the trial court found more than just a mere failure to follow up – the trial court also considered Altman's failure to have proper procedures in place and its failure to follow its own loosely-held informal procedure. Therefore, while Altman may have submitted the claim to AON and AON was admittedly negligent in failing to take action, Altman's own errors and omissions remained relevant for purposes of the hold harm/indemnity provision of the parties' Compensation Agreement.

Altman next argues that the trial court erred by applying the limitation of liability and indemnity clauses in the Compensation Agreement to bar the lawsuit. We disagree.

Altman argues that the provision is applicable because Altman committed no error or omission. However, as discussed above, the trial court did not clearly err in finding that Altman committed a number of errors and omissions that contributed to the default being entered in the Otero matter.

Altman then argues that the indemnity clause has no application because indemnity clauses only apply to claims by third parties and not between the parties, citing *Ray D Baker Contractor, Inc v Chris Nelsen & Son, Inc*, 1 Mich App 450; 136 NW2d 771 (1965). However, while indemnification provisions do not *generally* cover contract disputes between the parties, there is nothing to prevent the parties from contracting for indemnification based on contract performance. "Michigan law provides contracting parties with broad discretion in negotiating the scope of indemnity clauses." *Miller-Davis Co v Ahrens Const, Inc*, 495 Mich 161, 173; 848 NW2d 95 reh den 495 Mich 998 (2014). Parties can, and do, contract for indemnification liability beyond that arising from third-party claims when they use broad language. Indemnity clauses may, if the parties so intend, provide coverage for the indemnitee's own negligent acts. *Sherman v DeMaria Building Co, Inc*, 203 Mich App 593, 596-597; 513 NW2d 187 (1994); *Fischbach-Natkin Co v Power Process Piping, Inc*, 157 Mich App 448, 452; 403 NW2d 569 (1987); *Paquin v Harnischfeger Corp*, 113 Mich App 43, 52-53; 317 NW2d 279 (1982).

Altman argues that, even if the indemnity clause applies between the parties, AON is not entitled to indemnification for all damages or losses and indemnification is limited to only damages or losses arising from "such" error by Altman. It argues that Altman did not agree to indemnify AON for AON's breach of contract or negligence. Our Supreme Court has set forth the following standard for reviewing indemnity clauses:

> As with any other contract, our primary task in construing a contract for indemnification is to give effect to the parties' intention at the time they entered into the contract. We determine the parties' intent by examining the language of the contract according to its plain and ordinary meaning. In doing so, we avoid an interpretation that would render any portion of the contract nugatory. We assess the threshold question whether a contract's indemnity clause applies to a set of facts by a "straightforward analysis of the facts and the contract terms."
>
> Where parties have expressly contracted for indemnification, the extent of the duty must be determined from the language of the contract. [*Miller-Davis*, 495 Mich at 174 (internal footnotes and quotation marks omitted).]

In *Miller-Davis*, the indemnification agreement provided:

> You [Ahrens] as Subcontractor/Supplier agree to defend, hold harmless and indemnify Miller–Davis Company ... from and against all claims, damages, losses, demands, liens, payments, suits, actions, recoveries, judgments and expenses including attorney's fees, interest, sanctions, and court costs which are made, brought, or recovered against Miller–Davis Company, by reasons of or resulting from, but not limited to, any injury, damage, loss, or occurrence arising out of or resulting from the performance or execution of this Purchase Order and caused, in whole or in part, by any act, omission, fault, negligence, or breach of the conditions of this Purchase Order by the Subcontractor/Supplier, its agents, employees, and subcontractors regardless of whether or not caused in whole or in part by any act, omission, fault, breach of contract, or negligence of Miller–Davis

Company. The Subcontractor/Supplier shall not, however, be obligated to indemnify Miller–Davis Company for any damage or injuries caused by or resulting from the sole negligence of Miller–Davis Company. [*Miller-Davis*, 495 Mich 174-175.]

At issue was whether the clause applied to corrective work performed by the general contractor. The Court of Appeals had concluded that the indemnity provision did not apply because there had been no "claim or demand." The Supreme Court reversed, finding that "[t]he language used by the parties in contracting for indemnity is unambiguous and clearly intended to apply as broadly as possible." *Id.* at 175. The Court went on to state:

> While the indemnity clauses specifically mention a "claim," they also trigger liability more broadly, when "damages, losses, demands," or "expenses," result from "any act, omission, fault, negligence, or breach...." Furthermore, the definition of "claim" itself is broad. *Black's Law Dictionary* defines a claim as the "aggregate of operative facts giving rise to a right *enforceable* by a court," and "any *right* to payment or to an equitable remedy...." [*Id.* (internal footnotes omitted).]

In the case at bar, the broadly-worded indemnification agreement requires indemnification for "all" damages or losses "arising by reason of, or arising out of any error or omission" by Altman. Citing *MSI Const Managers,* Altman argues that "arising from such error or omission" in the indemnity clause is the equivalent of "to the extent" language as used in *MSI Const Managers,* which found that in the event that both parties to the contract were negligent, the indemnor was only responsible for indemnifying the indemnee for the percentage of the subcontractor's negligence. *MSI Const Managers,* 208 Mich App at 343-344. "Arising from" should not be given the limited interpretation that Altman suggests.

> "Arise" is defined as "to result; spring or issue." Random House Webster's College Dictionary (1997).

***

> In interpreting an insurance contract containing the language "arising out of," we held that such language requires a causal connection that is more than incidental. Similarly, in interpreting a workers' compensation statute, MCL 418.301, containing the language "arising out of," we held that this language requires a causal connection. [*People v Johnson*, 474 Mich 96, 100–101; 712 NW2d 703 (2006).]

This Court has also noted that "[t]he term "arising out of" does not mean proximate cause in the strict legal sense" and that "almost any causal connection or relationship will do." *Shinabarger v Citizens Mut Ins Co*, 90 Mich App 307, 313–314; 282 NW2d 301 (1979). "The question to be answered is whether the injury 'originated from,' 'had its origin in,' 'grew out of,' or 'flowed from'" the party's conduct. *Id.* Here, the broad language of the agreement encompasses indemnification for Altman's conduct because, as discussed in Issue I, its numerous errors and omissions played a part in the Otero default judgment. There was a causal connection between Altman's errors and omissions and the default judgment that was more than incidental.

-8-

Nor is *Badiee v Brighton Area Schools* helpful to Altman. In *Badiee*, this Court concluded that the parties' indemnification agreement was meant to apply solely to the indemnor's acts and not the indemnee's. *Badiee,* 265 Mich App at 352-355. This was true because the language of the parties' indemnification agreement was silent on the issue and the surrounding circumstances did not support a finding that the parties contemplated that the indemnee's own acts were included. In contrast, the indemnity provision in the case at bar could not be clearer: "To the fullest extent permitted by law, [AON] shall have no liability for any claim or liability asserted by [Altman] for any loss arising by reason of, or arising out of any error or omission by [Altman] including any failure to comply with Your duty of disclosure." The second provision provides: "Should any claim or action be brought against [AON] due to an error or omission by [Altman], [Altman] shall indemnify [AON] for all damages or losses arising from such error or omission." Thus, whereas indemnity as between the two parties was not specifically provided for in the indemnity agreement in *Badiee*, indemnity between the two parties was clearly contemplated and provided for in the case at bar.

The trial court concluded:

> The language in the Compensation Agreement in the present case is not limited, as in *MSI Const Managers*, and it is not absent, as in *Badiee*. The errors and omissions clause is expressly stated in the broadest possible terms. Aon has no liability for any claim made against Aon by Altman for any loss arising out of any error or omission by Altman.
>
> Beyond the broad nature of the language is the fact that it covers any claim by Altman against Aon. Unlike clauses that cover third party liability but are silent with respect to claims between indemnitor and indemnitee, this clause focuses only on claims made by Altman against Aon. This language conclusively shows that the parties contemplated some claim by Altman against Aon, such as breach of contract or negligence, and that Altman agreed to indemnify Aon even if Aon was negligent. Only in the face of Aon's sole negligence would the indemnification clause not apply. Aon is not solely negligent.
>
> Altman asks this Court to assist it in obtaining justice. Altman may have every right to be indignant over Aon's mishandling of its claim. One would not expect that a company at Aon's level would commit such an egregious error and cause its own client such enormous consequences. However, Altman freely contracted with Aon to indemnify Aon for Altman's own errors and omissions. When Altman did that, it took on the risk that it, too, would mishandle something as important as a multi-million dollar lawsuit. Despite the risk, Altman made no standard internal procedures for handling claims against it. What procedure they did have was either not known by essential people at Altman or was not followed in this case by essential people at Altman. Per Altman's agreement, Aon is not liable.

The trial court did not err in concluding that the parties' Compensation Agreement barred Altman's claims.

Finally, Altman claims that, even if it committed any errors or omissions, such comparative negligence was irrelevant to its breach of contract cause of action and also did not act as a complete bar to its negligence action. We disagree.

"As a general proposition, parties are free to enter into any contract at their will, provided that the particular contract does not violate the law or contravene public policy. . . . In a variety of settings, this Court has upheld the validity of exculpatory agreements or releases that absolve a party from liability for damages caused by the party's negligence." *Cudnik v William Beaumont Hosp*, 207 Mich App 378, 383–384; 525 NW2d 891 (1994). It is not contrary to the public policy of Michigan for a party to contract against liability for that party's own ordinary negligence. *St. Paul Ins v Guardian Alarm,* 115 Mich App 278, 283; 320 NW2d 244 (1982). And, as previously stated, "Michigan law provides contracting parties with broad discretion in negotiating the scope of indemnity clauses." *Miller-Davis,* 495 Mich at 173. The parties clearly contemplated their rights, duties and obligations when they freely entered into the broadly-worded indemnification agreement.

Affirmed.[1] As the prevailing party, AON may tax costs. MCR 7.219.

/s/ Kathleen Jansen
/s/ Kirsten Frank Kelly
/s/ Colleen A. O'Brien

---

[1] Having affirmed the trial court's order, we see no need to address AON's alternative grounds for affirmance.