CUDNIK v WILLIAM BEAUMONT HOSPITAL

Docket No. 156623. Submitted July 12, 1994, at Lansing. Decided November 7, 1994, at 9:20 A.M.

Barbara Cudnik, as personal representative of the estate of Joseph M. Cudnik, deceased, brought a wrongful death action in the Oakland Circuit Court against William Beaumont Hospital, alleging negligence, medical malpractice, and breach of contract. The court, Richard D. Kuhn, J., granted summary disposition for the defendant after finding that an exculpatory agreement executed by Joseph Cudnik before receiving treatment at the hospital constituted a valid release of liability between the parties. The plaintiff appealed.

The Court of Appeals *held*:

The exculpatory agreement in this case is contrary to public policy and therefore is invalid and unenforceable. A release or covenant not to sue that is executed by a patient before treatment is invalid and unenforceable to absolve a medical care provider from liability for medical malpractice and other acts of negligence related to the patient's medical care.

Reversed and remanded.

1. CONTRACTS — EXCULPATORY PROVISIONS — INVALID PROVISIONS.

An invalid exculpatory provision in a contract involves a transaction that exhibits some or all of the following characteristics: it concerns a business of a type generally thought suitable for public regulation; the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public; the party holds itself out as willing to perform the service for any member of the public coming within certain established standards; as a result of the essential nature of the service, in the economic setting of the transactions, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks its

REFERENCES

Am Jur 2d, Contracts §§ 23, 238, 297, 303; Physicians, Surgeons and Other Healers § 164.

Validity and construction of contract exempting hospital or doctor from liability for negligence to patient. 6 ALR3d 704.

services; in exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation with no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence; as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or the seller's agents.

2. CONTRACTS — VALIDITY — PUBLIC POLICY.
   Parties generally are free to enter into any contract at their will, provided that the particular contract does not violate the law or contravene public policy.

3. NEGLIGENCE — MEDICAL MALPRACTICE — EXCULPATORY AGREEMENTS.
   An exculpatory agreement executed by a patient before treatment by a medical care provider is not enforceable to absolve the medical care provider from liability for medical malpractice and other acts of negligence related to the patient's medical care.

*Sommers, Schwartz, Silver & Schwartz, P.C.* (by *Susanne Pryce*), for the plaintiff.

*Sullivan, Ward, Bone, Tyler & Asher, P.C.* (by *Michelle A. Thomas* and *Thomas M. Slavin*), for the defendant.

Before: DOCTOROFF, C.J., and SHEPHERD and J. R. KIRWAN,* JJ.

DOCTOROFF, C.J. Presenting an issue of first impression in Michigan, this case involves the validity of an exculpatory agreement executed by plaintiff's decedent before receiving radiation therapy at defendant hospital. The trial court granted summary disposition to defendant on the ground that "[p]laintiff's decedent signed a valid release of liability between the parties." We reverse and remand for further proceedings.

In March and April, 1985, Joseph Cudnik re-

* Circuit judge, sitting on the Court of Appeals by assignment.

ceived postoperative radiation therapy at William Beaumont Hospital after undergoing surgery for prostate cancer. Before receiving the radiation therapy, Cudnik signed a document on March 13, 1985, that stated in its entirety as follows:

> I hereby consent to and authorize the physicians and staff of the Department of Radiation Oncology at William Beaumont Hospital to administer to me such radium, x-ray, Cobalt 60, or other radioisotope therapy as may in their professional judgement deem to be necessary.
>
> I have discussed with my physician in the Department of Radiation Oncology, the course of treatment which has been recommended and planned for me and fully understand the benefit that such treatment may provide for me.
>
> Further, my physician in the Department of Radiation Oncology has fully explained to me the possibilities of reactions and the possible side effects of the treatment.
>
> I further understand that there is no guarantee given to me as to the results of radiation therapy.
>
> Understanding all of the foregoing, I hereby release the physicians and staff of the Department of Radiation Oncology and William Beaumont Hospital from all suits, claims, liability, or demands of every kind and character which I or my heirs, executors, administrator's [sic] or assigns hereafter can, shall, or may have arising out of my participation in the radiation therapy treatment regimen.

In early 1989, Cudnik returned to Beaumont Hospital complaining of back discomfort, whereupon he was diagnosed as suffering from a postradiation ulcer burn at the site where he received the radiation therapy in 1985.

On June 14, 1989, Joseph Cudnik and his wife, Bernice Cudnik, brought a medical malpractice action in propria persona against defendant. Ap-

proximately two weeks later, on July 1, 1989, Joseph Cudnik died. On December 29, 1989, the medical malpractice action was dismissed pursuant to MCR 2.102(E), when the summons expired before service of process was effectuated on defendant.

On May 29, 1991, plaintiff, as the personal representative of Joseph Cudnik's estate, commenced the present wrongful death action alleging negligence, medical malpractice, and breach of contract. Particularly relevant to this appeal, plaintiff alleged that the negligent administration of radiation therapy in 1985 caused or contributed to Joseph Cudnik's death.

On January 29, 1992, defendant moved for summary disposition pursuant to MCR 2.116(C)(7), (8), and (10). On September 1, 1992, the trial court granted defendant's motion after concluding that the exculpatory agreement between the parties precluded plaintiff's claims pursuant to MCR 2.116(C)(10).[1] Plaintiff appeals from that decision as of right. We reverse.

Although plaintiff alleges various acts of negligence by the hospital administration, the essence of plaintiff's claim is that the hospital should be held vicariously liable for the medical malpractice of its employees or agents. Medical malpractice has been defined by the courts of this state as

the failure of a member of the medical profession, employed to treat a case professionally, to fulfill the duty to exercise that degree of skill, care and diligence exercised by members of the same profession, practicing in the same or similar locality, in light of the present state of medical science. [*Cot-*

---

[1] The trial court also granted summary disposition for defendant pursuant to MCR 2.116(C)(8) with regard to plaintiff's claim of breach of contract. However, plaintiff has not appealed that portion of the court's order.

*ton v Kambly,* 101 Mich App 537, 540-541; 300 NW2d 627 (1980), citing *Kambas v St Joseph's Mercy Hosp,* 389 Mich 249; 205 NW2d 431 (1973).]

Another panel of this Court in *Carbonell v Bluhm,* 114 Mich App 216, 224; 318 NW2d 659 (1982), discussed medical malpractice as follows:

A treating physician is liable for damages when it is shown that he departed from the standard of care which is known as customary medical practice. *Wood v Posthuma,* 108 Mich App 226, 230; 310 NW2d 341 (1981). The measuring standard of care is founded upon how other doctors in that field of medicine would act and not how any particular doctor would act. *Rytkonen v Lojacono,* 269 Mich 270; 257 NW 703 (1934).

Our Legislature has codified the requirements for a claim of medical malpractice at MCL 600.2912a; MSA 27A.2912(1),[2] as follows:

[2] MCL 600.2912a; MSA 27A.2912(1) was recently amended by 1993 PA 78, effective April 1, 1994, to read as follows:

(1) Subject to subsection (2), in an action alleging malpractice, the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice or care in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

(b) The defendant, if a specialist, failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

(2) In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.

In an action alleging malpractice the plaintiff shall have the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

(b) The defendant, if a specialist, failed to provide the recognized standard of care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

We would note that the standard of care may fluctuate with the level of technology and general expertise in the medical community. The applicable standard of care for general practitioners is that of the local community or similar communities, while the standard of care for a specialist is nationwide. *Thomas v McPherson Community Health Center,* 155 Mich App 700, 708; 400 NW2d 629 (1986); *Bahr v Harper-Grace Hosps,* 198 Mich App 31, 34; 497 NW2d 526 (1993), lv gtd 445 Mich 861 (1994).

The question presented in this case is whether plaintiff's claim of medical malpractice is precluded by the aforementioned exculpatory agreement between the parties. Consistent with the overwhelming majority of other jurisdictions that have addressed this issue, we hold that the exculpatory agreement is invalid and unenforceable as against public policy.

As a general proposition, parties are free to

enter into any contract at their will, provided that the particular contract does not violate the law or contravene public policy. *Feldman v Stein Building & Lumber Co,* 6 Mich App 180, 184; 148 NW2d 544 (1967); *Michigan Ass'n of Psychotherapy Clinics v Blue Cross & Blue Shield of Michigan,* 101 Mich App 559, 573; 301 NW2d 33 (1980). In a variety of settings, this Court has upheld the validity of exculpatory agreements or releases that absolve a party from liability for damages caused by the party's negligence.[3] See *Dombrowski v Omer,* 199 Mich App 705; 502 NW2d 707 (1993) (festival event); *Paterek v 6600 Ltd,* 186 Mich App 445; 465 NW2d 342 (1990) (softball facility); *St Paul Fire & Marine Ins Co v Guardian Alarm Co,* 115 Mich App 278; 320 NW2d 244 (1982) (security alarm company). In other cases, however, this Court has declared such agreements unenforceable as being contrary to this state's public policy. See *Stanek v Nat'l Bank of Detroit,* 171 Mich App 734; 430 NW2d 819 (1988) (exculpatory clause in a bank's stop payment order held to be invalid on public policy grounds); *Allen v Michigan Bell Telephone Co,* 18 Mich App 632; 171 NW2d 689 (1969) (clause limiting liability for damages resulting from a telephone company's failure to include an ad in its Yellow Pages held invalid, because the parties were not in a position of equal bargaining power).

The question whether a hospital may absolve

---

[3] There is a corollary rule that an exculpatory clause that seeks to absolve a party from liability for its own negligence must be clear and unambiguous. *American Empire Ins Co v Koenig Fuel & Supply Co,* 113 Mich App 496, 499; 317 NW2d 335 (1982). In this case, the exculpatory agreement does not specifically mention negligence or medical malpractice. However, the agreement quite clearly attempts to absolve defendant of all liability "of every kind and character" arising out of the radiation therapy. Thus, the agreement is not void for ambiguity; the question is whether the agreement can be sustained despite its wide breadth.

itself from liability for the negligence of its employees via an exculpatory agreement signed by a patient is an issue of first impression in Michigan. The overwhelming majority of other jurisdictions that have addressed this question have held that such agreements are invalid and unenforceable because medical treatment involves a particularly sensitive area of public interest.[4] *Tunkl v Regents of the Univ of California,* 60 Cal 2d 92; 32 Cal Rptr 33; 383 P2d 441 (1963); *Ash v New York Univ Dental Center,* 164 AD2d 366; 564 NYS2d 308 (1990); *Smith v Hosp Authority of Walker, Dade & Catoosa Cos,* 160 Ga App 387; 287 SE2d 99 (1981); *Meiman v Rehabilitation Center, Inc,* 444 SW2d 78 (Ky App, 1969). Today we join in the view of these jurisdictions.

The leading case on this subject, *Tunkl, supra,* is often cited for its list of factors constituting the "public interest," as follows:

> In placing particular contracts within or without the category of those affected with a public interest, the courts have revealed a rough outline of that type of transaction in which exculpatory provisions will be held invalid. Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is

---

[4] An exception to the general rule invalidating exculpatory agreements for medical malpractice involves experimental procedures. Experimental procedures may require a different standard because, by their very nature, they require a deviation from generally accepted medical practices. In a case where an experimental procedure was the patient's last hope for survival, the New York Supreme Court held that "the parties may covenant to exempt the physician from liability for those injuries which are found to be the consequences of the nonnegligent, proper performance of the procedure." *Colton v New York Hosp,* 98 Misc 2d 957, 969; 414 NYS2d 866 (1979). However, the present case does not appear to involve an experimental procedure.

often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents. [*Id.* at 98-101.]

Although noting that an agreement need only fulfill some of the foregoing characteristics to be held unenforceable, the court in *Tunkl* found that the agreement in that case fulfilled all of the relevant criteria.

As in *Tunkl, supra,* we find that the agreement in this case also fulfills all of the relevant characteristics of a contract affecting the public interest. It is clear that hospitals and the medical profession have been thought to be suitable for public regulation.[5] MCL 333.21501 *et seq.;* MSA 14.15(21501) *et seq.,* MCL 333.17001 *et seq.;* MSA 14.15(17001) *et seq.* The performance of medical services is of great importance to the public, and is a matter of practical necessity for some members

[5] We are not persuaded by defendant's argument that the provision of medical care should be considered a "private affair." The courts have long recognized that the provision of medical care involves issues of public interest. *Lewis v State Bd of Dentistry,* 277 Mich 334, 343; 269 NW 194 (1936); *People v Cramer,* 247 Mich 127, 134; 225 NW 595 (1929).

of the public. Defendant hospital holds itself out as willing to perform medical services to members of the public. Defendant hospital certainly possesses an advantage in bargaining strength against any member of the public who seeks its services.[6] Defendant hospital presented plaintiff's decedent with the standardized contract of exculpation, without any provision for some other type of protection against negligence. Finally, it is readily apparent that plaintiff's decedent placed himself under the control of defendant hospital, subject to the risk of carelessness by the hospital or its agents.

Accordingly, for the foregoing reasons we find that the exculpatory agreement in this case is contrary to public policy. The exculpatory agreement constitutes a contract of adhesion,[7] and is unenforceable. *Tunkl, supra* at 102.

By our holding, we do not mean to intimate that all releases executed in cases of medical malpractice are invalid. Some releases executed after initiation of a suit, e.g., pursuant to a settlement for due consideration, will continue to be valid and enforceable. However, such "releases" or covenants not to sue executed before treatment are invalid and unenforceable.[8]

---

[6] We reject defendant's suggestion that the parties were operating with equal bargaining power when plaintiff's decedent signed the exculpatory agreement. When Joseph Cudnik signed the agreement, he was eighty-one years old and had been suffering from cancer. In contrast, defendant hospital employed a staff of able-bodied professionals to draft and solicit the subject agreement.

[7] Cf. generally concerning adhesion contracts, *Rehmann, Robson & Co v McMahan,* 187 Mich App 36, 43-44; 466 NW2d 325 (1991).

[8] We should note that the exculpatory agreement purports to "release" the hospital "from all suits, claims, liability, or demands of every kind and character . . . ." However, a release is generally thought to operate retrospectively. As aptly stated by the Supreme Court of New York in *Colton,* n 4 *supra* at 965:

A release is retrospective; a covenant not to sue, like any

Defendant expresses a concern that absent an ability to enforce such exculpatory agreements medical care providers will incur liability for certain inherent risks and unforeseen consequences of medical treatment. However, defendant need not rely on a covenant not to sue to protect itself from liability for inherent risks and unforeseen consequences. Under traditional tort law principles, medical care providers are not liable for such inherent risks and unforeseen consequences. A standard jury instruction, SJI2d 30.04,[9] is available to protect medical care providers from liability for inherent risks and medical uncertainties. Our Supreme Court in *Jones v Porretta,* 428 Mich 132, 146; 405 NW2d 863 (1987), signaled its approval of

---

other covenant, is prospective. A release discharges an existing obligation or cause of action. The consideration for the release acts as a substitute for performance under the prior obligation; the obligation, thus satisfied, is extinguished and a cause of action can therefore no longer exist. (15 Williston, Contracts [3d ed], § 1820; 5A Corbin, Contracts, § 1238.)

The most obvious example is that of the release given in exchange for the compromised settlement of an action or pre-existing claim, which completely discharges the cause of action.

In the present case, there was no claim in existence at the time that plaintiff's decedent signed the exculpatory agreement. As such, the use of the term "release" in the agreement is somewhat confusing. Because certain releases executed after the initiation of a claim may be enforceable, it may be helpful to reserve use of the term "release" to those cases. On the other hand, generally speaking, a covenant not to sue may be entered into either before or after the initiation of a claim. In a case of medical malpractice, however, a covenant not to sue that is entered into before treatment will be invalid and unenforceable on public policy grounds, as discussed herein. Cf. *Theophelis v Lansing General Hosp,* 430 Mich 473; 424 NW2d 478 (1988), on the distinction between releases and covenants not to sue as they affect third parties.

[9] SJI2d 30.04 provides as follows:

There are risks inherent in medical treatment that are not within a doctor's control. A doctor is not liable merely because of an adverse result. However, a doctor is liable if the doctor is negligent and that negligence is a proximate cause of an adverse result.

such a supplemental instruction[10] to protect medical providers from liability for inherent risks when it stated as follows:

> Where proofs put the significance of an adverse result in issue, it may be more appropriate to explain the physician's duty of care by advising the jury that there are inherent risks in medical treatment which are beyond the physician's control.

Accordingly, defendant need not and must not rely upon such broad exculpatory agreements to protect itself from liability for inherent risks and unforeseen circumstances.

Defendant also argues that statutory enactments, such as the statute authorizing arbitration of medical disputes, MCL 600.5040 *et seq.*; MSA 27A.5040 *et seq.*,[11] reflect a policy of this state to limit "the duty and nature of liability imposed on the physician." However, medical arbitration agreements merely provide for an alternate method of resolving disputes concerning medical treatment; they do not purport to relieve a hospital or physician from liability in the first instance for any negligent acts that may have been committed. Thus, there is an important distinction between medical arbitration agreements and exculpatory agreements like the one involved here.[12]

In sum, today we join the overwhelming major-

[10] See also *Domako v Rowe*, 184 Mich App 137, 149-150; 457 NW2d 107 (1990), aff'd 438 Mich 347; 475 NW2d 30 (1991).

[11] We would note that the statutory provisions cited by defendant concerning medical arbitration, MCL 600.5040 *et seq.*; MSA 27A.5040 *et seq.*, have recently been repealed, effective April 1, 1994. 1993 PA 78, § 2. The Legislature has added a new statutory section concerning medical arbitration, MCL 600.2912g; MSA 27A.2912(7). However, the details of medical arbitration are not particularly relevant to this appeal.

[12] We should note that our decision does not affect the status of the law concerning medical arbitration agreements.

ity of jurisdictions that hold that an exculpatory agreement executed by a patient before treatment is not enforceable to absolve a medical care provider from liability for medical malpractice and other acts of negligence related to a patient's medical care. Agreements such as the one involved in the case at bar are clearly against public policy.

We reverse the decision of the trial court and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

SHEPHERD, J., did not participate.