*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF LINDA HORN, by JOELYNN T. STOKES, Personal Representative,

Plaintiff-Appellant,

v

MICHAEL J. SWOFFORD, D.O., and SOUTHFIELD RADIOLOGY ASSOCIATES, PLLC,

Defendants-Appellees.

FOR PUBLICATION
October 22, 2020
9:00 a.m.

No. 349522
Oakland Circuit Court
LC No. 2018-164148-NH

Before: BOONSTRA, P.J., and MARKEY and HOOD, JJ.

MARKEY, J.

This is a medical malpractice action involving the death of Linda Horn allegedly caused by the negligence of defendant Michael J. Swofford, D.O., with respect to his interpretation of a cranial computerized tomography (CT) scan and his communications to other medical personnel based on that interpretation. As plaintiff, Horn's estate, through personal representative Joelynn T. Stokes, commenced the suit and now appeals by leave granted[1] the trial court's order denying plaintiff's motion to confirm that the one most relevant specialty in this case is neuroradiology. Instead, the trial court sided with defendants and concluded that diagnostic radiology is the one most relevant specialty. We reverse and remand for further proceedings.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

According to plaintiff, Horn, who was 24 years old when she died, had a history of pseudotumor cerebri, which occurs when pressure inside the skull increases for no obvious reason. As a result, Horn suffered frequent headaches. To address her medical condition, a "posterior parietal approach shunt catheter" was implanted in her head on February 22, 2013, to remove

---

[1] *Estate of Horn v Swofford*, unpublished order of the Court of Appeals, entered October 10, 2019 (Docket No. 349522).

cerebrospinal fluid (CSF). On February 26, 2013, Horn went to the emergency room complaining of a headache, nausea, and vomiting. A cranial CT scan was performed, and the shunt appeared to be stable and functioning properly. Horn was given pain medication and discharged. On March 2, 2013, Horn returned to the emergency room by ambulance. She was experiencing a severe headache, nausea, and vomiting. Another cranial CT scan was performed. The emergency room physician ordered the CT scan, a radiologist dictated the scan, and Dr. Swofford verified the results of the CT scan. The CT scan was interpreted as showing that the "[b]ilateral lateral ventricles ha[d] increased in size since [the] prior study, especially the right[,]" which "[c]orrelate[d] clinically for [a] malfunctioning shunt." After receiving the interpretation of the CT scan, the emergency room doctor performed a lumbar puncture to remove CSF and relieve pressure on Horn's brain.[2] Unfortunately, Horn's condition continued to deteriorate and on March 4, 2013, she died. An autopsy report indicated that Horn "showed a diffusely swollen brain without evidence of inflammation or infection."

Plaintiff filed a complaint alleging medical malpractice by Dr. Swofford and his practice group, defendant Southfield Radiology Associates, PLLC (SRA). Plaintiff alleged as follows regarding Dr. Swofford:

> That Defendant SWOFFORD . . . was negligent inter alia in the following particulars in that a licensed and practicing Neuroradiologist, when encountering a patient exhibiting the history, signs and symptoms such as those demonstrated by [Horn] had a duty to timely and properly:
>
> a. Possess the degree of reasonable care, diligence, learning, judgment and skill ordinarily and/or reasonably exercised and possessed by a board-certified Neuro Radiologist under the same or similar circumstances;
>
> b. Evaluate, interpret, report and intervene regarding Ms. Horn's head CT of March 2, 2013;
>
> c. Acknowledge the CT scan of March 2, 2013[,] showed a dramatic change when compared to the February 26, 2013 CT scan, that required neurological emergent surgery, intervention;
>
> d. Acknowledge and appreciate that the CT scan of March 2, 2013[,] showed that the ventricular system had become severely dilated with subtle areas of low density adjacent to the ventricles that suggest shunt obstruction and the transependymal flow of CSF;
>
> e. Acknowledge and appreciate that findings on the CT scan of March 2, 2013[,] indicated acute obstructive hydrocephalus which is a neurological emergency;

---

[2] While at the hospital on March 2, 2013, Horn suffered three seizures.

f. Acknowledge, appreciate and communicate that the brain in the CT scan of March 2, 2013[,] demonstrated downward transtentorial herniation and diffuse cerebral edema, all of which portent a devastating neurological injury in the absence of an urgent neurosurgical intervention;

g. Urgently communicate the head CT findings to the ordering physician and advise the ER physician that the patient must be treated by neurosurgery;

h. Notify and consult with neurosurgery;

i. Immediately advise the ER doctor that the findings on the March 2, 2013 CT of the head must be emergently addressed by neurosurgery tapping of the shunt or a placement of an EVD [external ventricular drain] and that he should avoid performance of a lumbar puncture because it would likely exacerbate herniation; [and]

j. Refrain from other acts of negligence which may become known through the course of discovery.

Plaintiff attached an affidavit of merit executed by Dr. Scott B. Berger, M.D., Ph.D., in which he asserted that he was a licensed medical physician specializing and board certified in the field of neuroradiology. Dr. Berger averred that he had spent the majority of his professional time in the year prior to the incident practicing neuroradiology or teaching neuroradiology. The affidavit of merit contained averments that mimicked the allegations in the complaint quoted above. Defendants filed their answer and an affidavit of meritorious defense executed by Dr. Swofford in which he averred that he was a board-certified diagnostic radiologist at the time of the events giving rise to plaintiff's action. Dr. Swofford contended that the standard of care in this matter required him to provide treatment equivalent to that performed by a reasonable board-certified diagnostic radiologist of ordinary learning, judgment, and skill under the same or similar circumstances. Dr. Swofford opined that he had complied with the appropriate standard of care with respect to the interpretation of Horn's cranial CT scan and his communications based on that interpretation.

Plaintiff moved to confirm that neuroradiology was the one most relevant specialty or subspecialty. Defendants argued in response that the one most relevant specialty was diagnostic radiology, not neuroradiology. The trial court denied plaintiff's motion and ruled that the one most relevant specialty in this case was diagnostic radiology. The court denied plaintiff's motion for reconsideration, and this appeal ensued.

II. ANALYSIS

A. STANDARDS OF REVIEW

This case turns on the interpretation of MCL 600.2169, and "[t]he construction of MCL 600.2169 presents a question of law subject to de novo review." *Crego v Edward W Sparrow Hosp Ass'n*, 327 Mich App 525, 531; 937 NW2d 380 (2019); see also *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006). We review for an abuse of discretion a trial court's decision concerning the qualifications of a proposed expert witness to testify. *Crego*, 327 Mich

App at 531. When a trial court's decision falls outside the range of principled and reasonable outcomes, the court abuses its discretion. *Id.* A court necessarily abuses its discretion when a particular ruling constitutes an error of law. *Id.*

## B. STATUTORY CONSTRUCTION

The *Crego* panel recited the principles that govern the construction of a statute, explaining as follows:

> When interpreting a statute, the primary rule of construction is to discern and give effect to the Legislature's intent, the most reliable indicator of which is the clear and unambiguous language of the statute. Such language must be enforced as written, giving effect to every word, phrase, and clause. Further judicial construction is only permitted when statutory language is ambiguous. When determining the Legislature's intent, statutory provisions are not to be read in isolation; rather, they must be read in context and as a whole. [*Crego*, 327 Mich App at 531 (quotation marks and citations omitted).]

## C. DISCUSSION

### 1. MEDICAL MALPRACTICE – GOVERNING LAW

"The plaintiff in a medical malpractice action bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Cox v Bd of Hosp Managers for the City of Flint*, 467 Mich 1, 10; 651 NW2d 356 (2002) (quotation marks and citation omitted). Failure to establish any one of these four elements is fatal to a plaintiff's medical malpractice suit. *Id*. The "standard of care is founded upon how other doctors in that field of medicine would act and not how any particular doctor would act." *Cudnik v William Beaumont Hosp*, 207 Mich App 378, 382; 525 NW2d 891 (1994) (quotation marks and citation omitted).

MCL 600.2912d(1) requires a medical malpractice plaintiff to "file with the complaint an affidavit of merit signed by a health professional who the plaintiff's attorney reasonably believes meets the requirements for an expert witness under section 2169." And in pertinent part, MCL 600.2169 provides:

> (1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:

> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

(b) Subject to subdivision (c)[inapplicable], during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

(*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

## 2. CONSTRUCTION OF MCL 600.2169 – THE MICHIGAN SUPREME COURT'S OPINION IN *WOODARD*

"[I]f a defendant physician is a specialist, the plaintiff's expert witness must have specialized in the same specialty as the defendant physician at the time of the alleged malpractice." *Woodard*, 476 Mich at 560-561. Additionally, plaintiff's expert is required to hold the same board certification as the defendant doctor if in fact the physician is board certified in the pertinent specialty. *Id*. While specialties and board certifications must match, not all of them are required to match. *Id.* at 558. "Because an expert witness is not required to testify regarding an inappropriate or irrelevant standard of medical practice or care, § 2169(1) should not be understood to require such witness to specialize in specialties and possess board certificates that are not relevant to the standard of medical practice or care about which the witness is to testify." *Id.* at 559. The *Woodard* Court noted that the language of MCL 600.2169(1)(a) only requires a single specialty to match, not multiple specialties. *Id.* In other words, "the plaintiff's expert does not have to match all of the defendant physician's specialties; rather, the plaintiff's expert only has to match the *one most relevant specialty*." *Id*. at 567-568 (emphasis added). The specialty engaged in by the defendant doctor during the course of the alleged malpractice constitutes the one most relevant specialty. *Id*. at 560.

In *Woodard*, our Supreme Court explored the meaning of the terms "specialty" and "specialist" as used in MCL 600.2169(1)(a), along with examining the concept of a subspecialty, stating:

Both the dictionary definition of "specialist" and the plain language of § 2169(1)(a) make it clear that a physician can be a specialist who is not board certified. They also make it clear that a "specialist" is somebody who can potentially become board certified. Therefore, a "specialty" is a particular branch of medicine or surgery in which one can potentially become board certified. Accordingly, if the defendant physician practices a particular branch of medicine or surgery in which one can potentially become board certified, the plaintiff's expert must practice or teach the same particular branch of medicine or surgery.

-5-

Plaintiffs argue that § 2169(1)(a) only requires their expert witnesses to have specialized in the same specialty as the defendant physician, not the same subspecialty. We respectfully disagree. . . . [A] "subspecialty" is a particular branch of medicine or surgery in which one can potentially become board certified that falls under a specialty or within the hierarchy of that specialty. A subspecialty, although a more particularized specialty, is nevertheless a specialty. Therefore, if a defendant physician specializes in a subspecialty, the plaintiff's expert witness must have specialized in the same subspecialty as the defendant physician at the time of the occurrence that is the basis for the action. [*Woodard*, 476 Mich at 561-562.]

### 3. DR. SWOFFORD AND DR. BERGER – CREDENTIALS AND DIAGNOSTIC RADIOLOGY VERSUS NEURORADIOLOGY

There is no dispute that Dr. Swofford was a board-certified diagnostic radiologist when he interpreted Horn's cranial CT scan on March 2, 2013. Dr. Swofford graduated from medical school in 1992, was a resident in diagnostic radiology at a hospital from 1993 to 1997, participated in a one-year fellowship in neuroradiology from July 1997 to June 1998, was employed as a staff radiologist from 1998 to 2006 at a couple of hospitals, began working at SRA in 2006, and was currently a partner at SRA. Dr. Swofford obtained a certificate of added qualification in neuroradiology in 2002, but the certificate had expired absent renewal by the time he interpreted Horn's CT scan. Dr. Swofford was chief of neuroradiology during a hospital stint from 2002 to 2006.

In his deposition, Dr. Swofford testified, "I read approximately 25 percent of neurology-related . . . studies, and 75 percent based on diagnostic general radiology." He additionally testified that radiologists at SRA interpret neuroimages even though they have no extra certification in neuroradiology. The parties agree that diagnostic radiologists are certified and permitted to interpret neuroimages. Dr. Swofford testified that he would not hold himself out to be a neuroradiologist.

Dr. Berger is board certified in diagnostic radiology, received a certificate of added qualification in neuroradiology in 2000, renewed the certificate in 2010, and was in the process of once again renewing the certificate of added qualification in neuroradiology at the time of his 2019 deposition.[3] Dr. Berger testified that he spends the "vast majority" of his time practicing

---

[3] Dr. Berger testified that technically there is no board certification in neuroradiology. Instead, a certificate of added qualification in neuroradiology is available. But the *Woodard* Court ruled that for purposes of MCL 600.2169, there effectively is no difference between being board certified and having a certificate of added or special qualification:

> Because a certificate of special qualifications is a document from an official organization that directs or supervises the practice of medicine that provides evidence of one's medical qualifications, it constitutes a board certificate. Accordingly, if a defendant physician has received a certificate of special

neuroradiology. In his deposition, he indicated that 90% to 95% of his practice consisted of neuroradiology and that the vast majority of his 25-year career had been focused on neuroradiology. Dr. Berger explained that "a CT scan of the head would fall into the category of a neuroimaging study." There is no dispute on that assertion. According to Dr. Berger, while every diagnostic radiologist is trained to interpret cranial CT scans, neuroradiologists have more expertise on the matter than diagnostic radiologists.[4] To obtain and maintain a certificate of added qualification in neuroradiology, a radiologist must have a "certain amount of reads per year" relative to neuroimages and must pass an examination establishing that he or she has a high level of proficiency in reading neuroradiological images.

## 4. APPLICATION OF FACTS TO LAW

Because the branch of medicine known as diagnostic radiology is one that provides or allows for board certification, diagnostic radiology is a "specialty" and a diagnostic radiologist is a "specialist" for purposes of MCL 600.2169(1). See *Woodard*, 476 Mich at 561-562. Taking into consideration the deposition testimony and recognizing that a physician can effectively become board certified in neuroradiology when a certificate of added qualification is bestowed on a doctor, see *id.* at 562, 565, it is clear that neuroradiology is also a "specialty" under the statute and more particularly a "subspecialty" of diagnostic radiology. The difficulty that arises in this case is that while no longer a board-certified, or its equivalent, neuroradiologist, Dr. Swofford was undoubtedly engaged in interpreting a neuroimage when he examined Horn's CT scan on March 2, 2013. Horn's CT scan could have been interpreted by a neuroradiologist or a diagnostic radiologist. We conclude that *Reeves v Carson City Hosp (On Remand)*, 274 Mich App 622; 736 NW2d 284 (2007), provides some guidance. In *Reeves*, this Court addressed the following set of circumstances:

> Catherine R. and Anthony L. Reeves filed this medical malpractice action against several defendants, including Lynn Squanda, D.O., who is board-certified in family medicine, but was working in the emergency room at the time of the alleged malpractice. The Reeveses claimed that Dr. Squanda and others were negligent in failing to timely diagnose and treat Catherine Reeves's ectopic pregnancy. The Reeveses filed an affidavit of merit signed by Eric Davis, M.D., who is board-certified in emergency medicine, but not board-certified in family medicine. [*Id.* at 623.]

---

qualifications, the plaintiff's expert witness must have obtained the same certificate of special qualifications in order to be qualified to testify under § 2169(1)(a). [*Woodard*, 476 Mich at 565.]

[4] Dr. Berger did testify that it was his "opinion that when it comes to a head CT, . . . the standard of care that applies to a neuroradiologist or a diagnostic radiologist is the same, because they are trained to interpret those studies as a resident."

-7-

The trial court in *Reeves* ruled that Dr. Davis was not qualified to give expert testimony against Dr. Squanda, but this Court vacated the trial court's order. *Id.* at 624. The *Reeves* panel reasoned and held:

> In sum, because Dr. Squanda was practicing emergency medicine at the time of the alleged malpractice and potentially could obtain a board certification in emergency medicine, she was a "specialist" in emergency medicine under the holding in *Woodard*. Thus, plaintiffs would need a specialist in emergency medicine to satisfy MCL 600.2169; Dr. Davis, as a board-certified emergency medicine physician, would satisfy this requirement. However, the specialist must have also devoted the majority of his professional time during the preceding year to the active clinical practice of emergency medicine or the instruction of students. Because there is no information in the record regarding what comprised the majority of the expert's professional time, a remand for a determination on this issue is necessary. [*Id.* at 630.[5]]

Indeed, as we quoted earlier, the Supreme Court in *Woodard*, 476 Mich at 561-562, observed that "if the defendant physician practices a particular branch of medicine or surgery in which one can potentially become board certified, the plaintiff's expert must practice or teach the same particular branch of medicine or surgery."

In this case, Dr. Swofford was, in fact, practicing neuroradiology when he examined and interpreted neuroimages—the CT scan of Horn's skull—and he potentially could obtain, as he had done in the past, board certification in neuroradiology. And therefore Dr. Swofford was acting or practicing as a "specialist" or "subspecialist" in neuroradiology, at least for purposes of MCL 600.2169(1) as interpreted by *Woodard*. Although Dr. Swofford was also practicing diagnostic radiology when he interpreted Horn's CT scan considering that diagnostic radiologists are credentialed to interpret neuroimages, neuroradiology was the one most relevant specialty.

We do find it necessary to distinguish the facts in this case from those presented in *Woodard*. In *Woodard*, the defendant physician was board certified in pediatrics and also had certificates of special qualifications in pediatric critical care medicine and neonatal-perinatal medicine, but the plaintiff's proposed expert was only board certified in pediatrics and had no certificates of special qualifications. *Woodard*, 476 Mich at 554-555. The Supreme Court held that the one most relevant specialty in the case was pediatric critical care medicine; therefore, the

---

[5] Defendants argue that *Reeves* is distinguishable because there the defendant doctor was practicing outside her board certification, and it did not involve, as here, the overlap between a specialty and a subspecialty. We disagree. The whole point of *Reeeves* is that if a defendant physician was practicing a particular branch of medicine when the malpractice allegedly occurred, and board certification was available for the practice of that branch of medicine, then the physician was engaged in a "specialty" for purposes of MCL 600.2169, and the plaintiff's expert must have practical and/or teaching experience in that specialty. We see no difference in relation to the analysis if the case entails a defendant family doctor actually practicing emergency medicine or if the case regards a diagnostic radiologist actually practicing, more specifically, neuroradiology— the overlap in the latter is not a basis to jettison the principle.

plaintiff's expert did not satisfy the same specialty requirement of MCL 600.2169(1)(a). *Id.* at 576. In this lawsuit, Dr. Swofford did not practice a specialty or have a board certification that was lacking in Dr. Berger.

In *Hamilton v Kuligowski*, the companion case to *Woodard*, the underlying facts were as follows:

> Plaintiff alleges that the defendant physician failed to properly diagnose and treat the decedent while she exhibited prestroke symptoms. The defendant physician is board certified in general internal medicine and specializes in general internal medicine. Plaintiff's proposed expert witness is board certified in general internal medicine and devotes a majority of his professional time to treating infectious diseases, a subspecialty of internal medicine. [*Woodard*, 476 Mich at 556.]

Our Supreme Court held that the plaintiff's proposed expert did not qualify to give testimony on the standard of care under MCL 600.2169, noting that the expert himself acknowledged that he was "not sure what the average internist sees day in and day out." *Id.* at 577-578. As opposed to the situation in *Hamilton* in which the expert witness's subspecialty in treating infectious diseases was not pertinent to diagnosing prestroke symptoms, Dr. Berger's credentials as a neuroradiologist were extremely relevant to the interpretation of neuroimages. Dr. Berger certainly knows what the average radiologist sees day in and day out. Stated differently, the defendant doctor in *Hamilton* was not practicing infectious disease medicine in treating the decedent, but Dr. Swofford was plainly practicing neuroradiology in interpreting decedent Horn's CT scan.

Finally, although it is an unpublished opinion, we feel compelled to touch on this Court's decision in *Higgins v Traill*, unpublished per curiam opinion of the Court of Appeals, issued July 30, 2019 (Docket No. 343664), because it is a very similar case. In *Higgins*, this Court affirmed the trial court's ruling in the context of the following facts:

> In October 2013, plaintiff, Joan Higgins, collapsed in her home. When Emergency Medical Services (EMS) arrived, Higgins could not speak, had right-sided weakness, and was experiencing facial droop. Higgins was transported to St. John Macomb-Oakland Hospital. Relevant to this appeal, plaintiffs argue that Dr. Fry read a CT angiogram of Higgins's head as normal when it actually showed an occlusion in the middle cerebral artery. Plaintiffs contend that Dr. Fry's failure to properly read the CT angiogram delayed Higgins's treatment, which caused her to experience the full effect of an ischemic stroke and resulted in her sustaining permanent neurological deficits.

> Following discovery, defendants moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiffs' experts, Dr. Meyer and Dr. Zoarski, were not qualified to provide standard-of-care testimony under MCL 600.2169. Specifically, defendants asserted that the specialty that Dr. Meyer and Dr. Zoarski spent the majority of their time practicing—neuroradiology—did not match Dr. Fry's specialty—diagnostic radiology—so they were not qualified to testify against Dr. Fry. Plaintiffs, however, maintained that the specialty matched because at the

time of the alleged malpractice Dr. Fry was practicing neuroradiology, not diagnostic radiology. The trial court agreed with plaintiffs, holding that Dr. Meyer and Dr. Zoarski were qualified to testify as experts against Dr. Fry under MCL 600.2169 and MRE 702, and denying defendants' motion for summary disposition. [*Higgins*, unpub op at 2.]

As we did above, the *Higgins* panel relied on *Woodard* and *Reeves* in affirming the trial court's ruling. *Higgins*, unpub op at 4-6. The Court observed that when defendant Dr. Fry was reading the brain angiogram, "he was engaged in the practice of neuroradiology." *Id.* at 4. The Court held that it could "discern no error in the court's determination that the relevant specialty was neuroradiology because that was what Dr. Fry was practicing when he read the CT angiogram." *Id.* We agree with this Court's ruling and reasoning in *Higgins*.[6] Moreover, on application for leave to appeal in *Higgins*, three Justices voted to deny leave, three Justices voted to direct oral argument on just the application, and one Justice did not participate due to a familial relationship. *Higgins v Traill*, 941 NW2d 670 (2020). Accordingly, the application for leave to appeal was denied. *Id.* Based on the facts and the case law, we conclude at this juncture that MCL 600.2169(1), as construed in *Woodard*, *Reeves*, and *Higgins*, supports our ruling.

We reverse and remand for proceedings consistent with this opinion. We do not retain jurisdiction. Having fully prevailed on appeal, plaintiff may tax costs under MCR 7.219.

/s/ Jane E. Markey
/s/ Karen M. Fort Hood

---

[6] "Although MCR 7.215(C)(1) provides that unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value." *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017). Additionally, we agree with the *Higgins* panel's reasoning in rejecting the contention that the Supreme Court implicitly overruled *Reeves* in an order in *Estate of Jilek v Stockson*, 490 Mich 961 (2011). *Higgins*, unpub op at 6.